Walter E. PARKER, Appellant,

v.

Patricia Roberts HARRIS, Secretary of Health, Education and Welfare, Appellee.

No. 830; Docket 79–6240.

United States Court of Appeals, Second Circuit.

Argued March 5, 1980.

Decided June 18, 1980.

---

Dan Jerman, Vermont Legal Aid, Inc., Rutland, Vt., for appellant.

George Eng, Asst. Regional Atty., HEW, Boston Mass. (Donna McCarthy, Asst. Regional Atty., HEW, Boston, Mass., William B. Gray, U. S. Atty., and Peter W. Hall, Asst. U. S. Atty., Rutland, Vt., on the brief), for appellee.

Before FEINBERG, NEWMAN and KEARSE, Circuit Judges.

KEARSE, Circuit Judge:

Appellant Walter E. Parker brought this action in the district court under 42 U.S.C. § 405(g) seeking review of a final decision of the Secretary of Health, Education, and Welfare denying his application for social security disability benefits. The district court affirmed the Secretary's determination that on June 30, 1976, the last date on which appellant met the special earnings requirements for disability insurance coverage, he was not disabled within the meaning of 42 U.S.C. § 423. We conclude that the decision of the Secretary that appellant's physical condition did not prevent his resuming his prior work or performing other work was not supported by substantial evidence. We reverse and remand to the Secretary for the computation and payment of benefits.

## I

Parker was born in 1921 and attended school until he was sixteen years old, advancing through the sixth grade. After leaving school he worked for the WPA for one year and then did road construction work until he entered the Army in 1942. He received no vocational training while in the Army. In 1946 Parker left the service, and from that time until 1974 his work experience consisted primarily as a carpenter's helper and a mason's helper in the building and road construction industries. In these jobs, he mixed, poured and carried cement, carried lumber and bricks and put up scaffolding. He did no actual sawing, nailing or building of his own. In addition, Parker held several factory jobs which, like

the construction jobs, appear to have required unskilled physical labor. One such job involved baking paint, and required him to place large formica-type sheets, approximately four feet by eight feet, in an oven. In another factory job, his assignment was to cut paper off large rolls. From 1973 to 1974, appellant worked in a slate quarry, moving slate through a machine. He ceased working in July 1974, allegedly because of emphysema.

On August 23, 1977, appellant filed an application for social security disability benefits claiming total and permanent disability due to emphysema.[1] The application was denied initially and on reconsideration. In September 1978, a hearing de novo was held before an Administrative Law Judge ("ALJ"). Parker appeared personally, as did his wife who also gave evidence. Parker testified about the nature of his work experience as set forth above, about his reasons for stopping work in 1974, and about his health since 1974. The record also included a variety of medical evidence including hospital records, reports of four physicians, emergency rescue squad reports, and reports of other federal and state agencies as to Parker's disability.

Parker testified that he ceased work in the slate quarry in July 1974 because he was having trouble breathing, had become dizzy and had fallen.[2] The record reveals that Parker had first been seen by one of his treating physicians, whose reports are described below, in March 1974 and that his history of emphysema had begun some two years earlier. After July 1974, Parker suffered repeatedly from shortness of breath and dizziness, chest pains four or five times a week, and episodes of falling as a result of his dyspnea and dizziness. He was hospitalized on at least six occasions, three of which occurred prior to June 30, 1976, the date on which his social security insured status expired.[3] Mrs. Parker testified that during some of Parker's attacks he had fallen to the floor gasping for breath, unable to talk, and she had had to summon the Granville Rescue Squad.[4] A letter from a captain of the Rescue Squad indicates that the Rescue Squad came to Parker's aid three times, each occasion being classed as "Emergency!" On at least two of these occasions Parker was admitted to Emma Laing Stevens Hospital—once with breathing problems, and once with chest pains that were later diagnosed as congestive heart failure.[5] Since approximately 1975, Parker has been taking prescribed medications, including quibron before meals and at bedtime, tetracycline at bedtime, and valium three times a day. In addition, he has used a "breathing machine" at home up to three or four times a week.

Parker testified that his impairment had limited his daily activities and had eliminated all former hobbies. He has no social life and no activities other than walking his dog three times a day for short distances. He cannot walk long distances and has difficulty walking uphill or up stairs. He can no longer do such things as shovel snow or play ball with his daughter. He used to hunt and fish regularly; he has not engaged in

---

1. Appellant had previously applied for social security disability benefits on April 29, 1974 and for supplemental security income benefits on September 2, 1976. Both applications were denied.

2. Parker was awarded workmen's compensation benefits for a few months after he left the quarry.

3. To be insured for disability benefits in a given month, an individual must meet certain earning requirements for twenty of the forty quarters ending with the quarter in which that month occurred. 42 U.S.C. §§ 423, 414, 413. The earnings requirement is not at issue in this case.

4. Granville Rescue Squad, Inc. is an organization affiliated with the New York State Volunteer Ambulance and First Aid Association and the International Rescue and First Aid Association.

5. The letter from the Rescue Squad, dated in April 1978, lists June 9, 1978 as the third occasion on which the Squad responded to a call from Parker. We assume, in view of the date of the letter, that the actual date of the emergency was June 9, 1977. Emma Laing Stevens Hospital records show that Parker was treated in its Emergency Room on June 9, 1977.

these activities since he stopped work. Parker stated that he is "sleepy all the time" and that in addition to eight hours at night, he sleeps three to four hours during each day. He indicated that he had reduced his cigarette smoking from three-to-four packs a day to about one-half pack a day.

At and after the hearing, records of Emma Laing Stevens Hospital were submitted, showing that on at least five occasions between December 1974 and January 1978, Parker was admitted for treatment and remained hospitalized for periods of five to eight days.[6] On December 10, 1974, he was admitted because of "increased dyspnea with lightheadedness and unsteadiness upon walking, numbness and tingling of the hands and feet and a 'funny feeling' in his chest." The diagnosis on this occasion included "chronic pulmonary emphysema" and "hyperventilation syndrome." He was released on December 16 as "fully ambulatory without distress" but was admitted again on December 25, 1974 with similar symptoms and diagnosis. He remained in the hospital until December 29. Parker was admitted again on March 20, 1975, with a diagnosis of "Hyperventilation with a chronic Emphysema"; he was discharged as improved on March 24, 1975. On May 27, 1977, appellant was brought to the Emergency Room and then admitted to the hospital. The records state that "[t]he hyperventilation was of such severity that outpatient control was impossible and he is known to have a longstanding history of chronic obstructive lung disease." Parker was discharged on June 1, 1977, but was brought into the Emergency Room on June 9, 1977 for breathing difficulty. He was next admitted for treatment on January 2, 1978, due to "acute respiratory difficulty and early stages of congestive heart failure." On January 9, 1978, he was discharged with a "final diagnosis" of "acute respiratory distress" and "congestive heart failure."

The record includes reports by two doctors, Dr. Foote and Dr. Edison, who are identified in all of the Emma Laing Stevens Hospital records as Parker's treating physicians. In a report dated May 17, 1977, Dr. Foote stated that appellant "has had emphysema for a long period" and "hasn't been able to work for the last three years." Concluding that the "patient is chronically incapacitated by his advanced pulmonary disease," the report stated as follows:

> *Any exertion, (climbing stairs or lifting or walking)—he has to stop (every 100 ft. when walking). If he tries to push himself any further he becomes dyspnic [sic] even turning blue. . . .* [T]he patient is on Quibron, Valium & Dalmane. These have given him some response but still *does [sic] not allow him to go to any physical activity what so ever [sic].* With his past history as a construction worker it is felt he will never work at his job again. *He has never had any training which would lead him to a very light duty job which he might handle such as bookkeeping. At 55 yrs. of age, it is not felt he [sic] would be a profitable situation to try educating this individual. Therefore it is felt he will be permanently disabled. (Emphasis added.)*

In a letter dated May 10, 1978, Dr. Foote stated:

> In regard to Walter E. Parker, this patient has been under our treatment for lung disease, dating back at least through March, 1974. His condition has worsened since then. His emphysemia [sic] has advanced, and he is prone to lung infections, and needs to avoid strenuous labor. He tires easily and with minimal exertion, my feeling is that this should preclude his working. His lung tissue will not regenerate and his disabilities are permanent.

Dr. Edison, who began treating Parker on March 20, 1974, similarly stated in a letter dated June 15, 1978, that Parker "has been continuously disabled because of obstructive lung disease" since 1974.

6. One of Parker's treating physicians reported that Parker had been hospitalized a total of seven times by January 1978.

In addition to his two treating physicians, Parker was examined by two other physicians. Dr. Brislin who examined Parker on May 20, 1977, at the instance of the Vermont Department of Social and Rehabilitation Services, diagnosed Parker as suffering from emphysema, and "[r]ecommend[ed] that he apply for Disability under Social Security." Based partly on this report, the Vermont agency concluded that "Mr. Parker is [not] feasible for vocational rehabilitation services due to his age—56; health—emphysema; and work history—mainly heavy labor."

In October 1977, Parker was examined by Dr. Gunaratnam, apparently at the instance of Vermont's Disability Determination Agency in cooperation with the Social Security Administration. Dr. Gunaratnam's report of October 25, 1977 described appellant's symptoms and included the results of a chest x-ray, an electrocardiogram, a blood test, a urine examination and pulmonary function tests. Although some of the physical and laboratory examination results were characterized as "normal," the report noted the existence of emphysema and "[r]ecurrent attacks of bronchitis by history." Dr. Gunaratnam noted that Parker "can walk on the flat for about fifty yards without getting short of breath. Climbing stairs, even if it is only a few steps, makes him dyspneic." He expressed no view as to Parker's ability to work.

The record contains virtually no evidence as to what type of jobs, if any, Parker's circumstances would allow him to perform. No vocational expert was called to testify. Other than the reported statement by Dr. Foote that Parker had no training that would suit him for a light duty job such as bookkeeping, "which he might handle," the vocational evidence consisted essentially of Parker's answers to two questions by the ALJ: Parker testified that his "hardest" job had been in building construction because it involved "carry[ing] cement, carrying bricks, putting up scaffolding"; he testified that his "easiest" job had been road work because "you flag [traffic] sometimes."

The ALJ concluded that Parker was not disabled as of June 30, 1976, stating that he was relying primarily on medical evidence. He acknowledged that most of appellant's jobs "have been either unskilled or laborious" and that he suffers from a "pulmonary impairment"; but he concluded that "there seems [to be] no probative reason why Parker could not have at all times here pertinent, and even, now perform a past job as flagman, or, if not that, then jobs such as also sedentary custodial, security or similar existent employment."

Parker sought review by the Appeals Council contending that the ALJ had erred in his disability conclusions and his vocational finding. The Appeals Council declined review, stating in part that "[f]or the administrative law judge to obtain current vocational testimony on jobs [appellant] could have performed on June 30, 1976, would now be inappropriate." The decision of the ALJ thus became the final decision of the Secretary.

Parker petitioned the United States District Court for the District of Vermont for review of the Secretary's decision pursuant to 42 U.S.C. § 405(g). The district court affirmed, noting that appellant had been hospitalized only three times between 1974 and May 1977 and that although his condition was unstable, there was substantial evidence to support the ALJ's determinations. This appeal followed.

## II

### A. *The Statutory Framework*

■ A determination of disability for purposes of entitlement to social security disability benefits requires a conclusion that the claimant's health was so impaired as to prevent him from performing his previous work and to prevent him from performing any other substantial gainful work that exists in the economy. Thus, 42 U.S.C. § 423(d)(1)(A), defines "disability," as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." Section 423(d)(2)(A), added to the statute in 1968, provides that for purposes of § 423(d)(1),

an individual . . . shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

The burden of proving disability is on the claimant. 42 U.S.C. § 423(d)(5); *Gold v. Secretary of HEW*, 463 F.2d 38, 41 (2d Cir. 1972); *Flores v. Department of HEW*, 465 F.Supp. 317, 319–20 (S.D.N.Y. 1978). Once the claimant has established a prima facie case, by showing that his impairment prevents his return to his prior employment, the burden shifts to the Secretary, who must produce evidence to show the existence of alternative substantial gainful work which exists in the national economy and which the claimant could perform, considering not only his physical capability, but as well his age, his education, his experience and his training. *See, e. g., Bastien v. Califano*, 572 F.2d 908, 912–13 (2d Cir. 1978);[7] *Hall v. Secretary of HEW*, 602 F.2d 1372, 1375 (9th Cir. 1979); *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir.

1978); *Small v. Califano*, 565 F.2d 797, 800 (1st Cir. 1977); *Thompson v. Mathews*, 561 F.2d 1294, 1296 (8th Cir. 1977); *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976); *Lewis v. Weinberger*, 515 F.2d 584, 587 (5th Cir. 1975); *Meneses v. Secretary of HEW*, 442 F.2d 803, 807 (D.C. Cir. 1971); *Flores v. Department of HEW, supra*; *Phillips v. Department of HEW*, 453 F.Supp. 1047, 1051 (S.D.N.Y.1978).

In reaching a conclusion as to disability, both objective and subjective factors are to be considered. These include objective medical facts, diagnoses or medical opinions based on such facts, subjective evidence of pain or disability testified to by the claimant or other witnesses, and the claimant's educational background, age, and work experience. *Rivera v. Harris*, 623 F.2d 212 (2d Cir. 1980); *Bastien v. Califano, supra*, 572 F.2d at 912; *Gold v. Secretary of HEW, supra*, 463 F.2d at 41 n.2. These factors need not be given equal weight. The expert opinion of a claimant's treating physician is entitled to particular weight. *See, e. g., Eiden v. Secretary of HEW*, 616 F.2d 63 (2d Cir. 1980); *Albarado v. Califano*, 605 F.2d 34 (2d Cir. 1979); *Bastien v. Califano, supra*; *Gold v. Secretary of HEW, supra*, 463 F.2d at 42.

It is not the function of a reviewing court to determine de novo whether the claimant is disabled. Assuming the Secretary has applied proper legal principles, judicial review is limited to an assessment of whether the findings of fact are supported by substantial evidence; if they are supported by such evidence, they are conclusive. 42 U.S.C. § 405(g); *Rivera v. Harris, supra*, 623 F.2d 212; *Bastien v. Califano, supra*, 572 F.2d at 912; *Gold v. Secretary of HEW, supra*, 463 F.2d at 42. "Substantial evidence" means "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate

---

7. In *Bastien*, the Court did not expressly explore the question of burden of proof. However, the panel noted that the claimant had presented proof that he had been fired from one job, and had been rejected for another job, as a bad health risk, and stated as follows:

Moreover, we believe it is insufficient for the Secretary to assert that Bastien might do jobs of a light and sedentary nature such as checker without providing a job description clarifying the nature of the job, demonstrating that the job does not require significant stooping and walking.

to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971), quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938).

Applying these principles to the record before us, we conclude that Parker was entitled to disability benefits because he presented substantial uncontradicted evidence that prior to June 30, 1976, his health prevented his return to his previous work, and the Secretary presented no evidence that there was any other substantial gainful work in the economy that Parker could do.

### B. *Parker's Ability To Return to His Prior Work*

Both Dr. Foote and Dr. Edison, appellant's treating physicians, expressed the opinion that appellant was disabled and that his disability began as early as 1974. The Secretary apparently recognizes that "[t]he expert opinions of a treating physician as to the existence of a disability are binding on the factfinder unless contradicted by substantial evidence to the contrary." *Bastien v. Califano, supra. See also Eiden v. Secretary of HEW, supra; McLaughlin v. Secretary of HEW*, 612 F.2d 701 (2d Cir. 1980); *Alvarado v. Califano, supra*, 605 F.2d at 35; *Gold v. Secretary of HEW, supra.* She argues, however, that the opinions of appellant's treating physicians do not require a finding of disability in this case because the opinions post-dated the last date on which appellant met the special earnings requirement and because the opinions are contradicted by substantial evidence.[8] Neither contention has merit.

■ Both of Parker's physicians, who had treated him since 1974, expressly stated that Parker had been disabled since at least 1974: in a 1977 report Dr. Foote stated that Parker had not been able to work in three years; in a 1978 report Dr. Edison stated that Parker had been "continuously disabled because of obstructive lung disease"

since Dr. Edison first examined Parker in March 1974. The fact that these evaluations were expressed after the end of Parker's insured period is of no moment. The "diagnosis of a claimant's condition may properly be made even several years after the actual onset of the impairment," and by a physician who had not theretofore treated the claimant. *Stark v. Weinberger*, 497 F.2d 1092, 1097 (7th Cir. 1974). Here, the diagnosis of emphysema, which formed the basis for the opinion that Parker was disabled, was made repeatedly prior to the expiration of Parker's insurance, by physicians who actually treated Parker during and after that period. These physicians were in the best position to evaluate appellant's condition, and their opinions must be credited if there is no substantial evidence to contradict them.

We find no such contradicting evidence in the record. Mr. and Mrs. Parker testified to Parker's frequent attacks. The Granville Rescue Squad had to come to Parker's aid three times. The hospital records show that appellant was hospitalized at least five times in a period of approximately three years, including three times between December 10, 1974 and March 20, 1975. Although some of the evidence relates to events after the expiration of Parker's insured status it cannot thereby be ignored, since evidence of an applicant's condition "'subsequent to the date upon which the earning requirement was last met is pertinent evidence in that it may disclose the severity and continuity of impairments existing before the earning requirement date . . . .'" *Gold v. Secretary of HEW, supra*, 463 F.2d at 41–42, quoting *Carnevale v. Gardner*, 393 F.2d 889, 890 (2d Cir. 1968). The diagnoses resulting from the hospitalizations are entirely consistent with the opinions offered by the treating physicians. We cannot find, as the Secretary urges, that these hospital records contradict the treating physicians on the basis that when Parker's condition which caused his hospi-

---

8. It is also argued that Dr. Foote felt Parker could do light or sedentary work. See Part II C. *infra.*

talization improved, he was released from the hospital. Nor do we accept the argument that the absence of reports reflecting hospitalization between March 1975 and May 1977 constitutes substantial evidence to contradict the treating physicians' opinion that Parker was continually disabled during this period.

The views expressed by the non-treating physicians are consistent with those of the treating physicians. Dr. Brislin concluded that Parker was medically eligible for a rehabilitation program, and Dr. Gunaratnam expressed no view as to the appellant's ability to work. While Dr. Gunaratnam's report shows some "normal" test results, he expressly noted Parker's inability to walk more than short distances or to climb more than a few stairs without becoming dyspneic. This observation and his "impression" of emphysema are hardly inconsistent with the reports of Drs. Foote and Edison.

Finally, the view of the treating physicians that Parker was disabled was corroborated by the findings of the Vermont Department of Social and Rehabilitation Services and the Veterans Administration. On the basis of a 1977 examination, the Vermont agency determined that Parker was sufficiently disabled, but too old and untutored to be rehabilitated. And in 1976, the Veterans Administration awarded Parker disability benefits retroactive to May 1974. "While the determination of another governmental agency that a social security disability benefits claimant is disabled is not binding on the Secretary, it is entitled to some weight and should be considered." *Cutler v. Weinberger*, 516 F.2d 1282, 1286 (2d Cir. 1975).

We conclude that the Secretary was required to accept the opinions of Dr. Foote and Dr. Edison that Parker was disabled from performing his previous work. The ALJ's conclusory finding that Parker could have performed his former job as "flagman" is unsupportable on several grounds. First, it was not shown that such a job exists. The only evidence relating to appel-

lant's former work as a "flagman" is his testimony that his "easiest" job was road construction because "sometimes" he only had to flag traffic. There is no evidence that he was actually employed solely as a "flagman" or even that such a job uncombined with heavy labor, actually exists in the national economy. Moreover, even if such a job exists the record strongly suggests that Parker would be unable to perform it. There is no evidence as to the amount of exertion that such a job would require, but while undoubtedly easier than carrying cement, it would obviously involve some exertion. Dr. Foote reported that even with medication Parker was unable to do "any physical activity" whatever. He noted that with "any exertion" Parker has to stop, otherwise he "becomes dyspnic [sic], even turning blue." Finally, for the ALJ to suggest that a person with advanced emphysema who is "prone to lung infections" should work in the dusty environment of road construction is surely unthinking.

C. *Parker's Ability To Perform Other Existing Work*

As noted above, the ALJ did not call a vocational expert to testify. Instead, he concluded, relying largely on a statement by Dr. Foote, that Parker was capable of performing light or sedentary work such as custodial or security jobs. What Dr. Foote suggested was that if Parker were younger and had the training, he "might handle" a "light duty job" such as bookkeeping. That Parker may have had the physical capacity to perform certain jobs, however, does not warrant rejection of a disability claim unless the Secretary shows that such jobs existed in the national economy and that the claimant could perform those jobs, in light of his age, education and work experience. The Secretary argues that she was entitled to take administrative notice of the existence of custodial or security jobs. While we do not preclude the taking of such notice in an appropriate case, *see McLamore v. Weinberger, supra,*[9] we

9. In *McLamore v. Weinberger*, the court found that "the conclusion that McLamore can en-

gage in a number of light manual and semiskilled jobs is within the common knowledge

reject it here because there was no "job description clarifying the nature" and requirements of such jobs, *Bastien v. Califano, supra*, 572 F.2d at 912–13, and no showing whatever that Parker would have been able to perform such jobs.

As discussed in the previous section, Parker's doctors opined that he was unable to engage in any physical activity whatever, unable to walk very far, unable to climb more than a few stairs, unable to do any lifting. Moreover, the testimony showed that Parker was very sleepy all the time and, despite a regular eight hours' sleep at night, slept three to four hours during each day. Thus the record failed to disclose that Parker was physically capable of performing custodial or security work. Nor did it show any training or skills for this type of work. Despite the ALJ's statement that Parker had ample intelligence, the fact remains that Parker had no training beyond the sixth grade level—a "marginal education" by the Secretary's standards. *See* 20 C.F.R. § 404.1507(c).

The absence of any proof as to Parker's ability to perform such jobs is particularly conspicuous in light of the Secretary's regulations covering claimants with a long history of arduous physical labor. Regulation 20 C.F.R. § 404.1502(c) provided, in pertinent part as follows: [10]

> Where an individual with a marginal education and long work experience (e. g., 35 to 40 years or more) limited to the performance of arduous unskilled physical labor is not working and is no longer able to perform such labor because of a significant impairment or impairments and, considering his age, education, and

vocational background is unable to engage in lighter work, such individual may be found to be under a disability.

■ Parker fit this profile exactly. He was 55 years old and had had a marginal education. He worked in the building construction or road construction industries, performing arduous unskilled jobs, for approximately 38 years, less his time in the Army. He is not working because of difficulty in breathing, and his doctors have expressed the opinion, uncontradicted by anything in the record, that he cannot return to his old work. And the record is barren of any indication that Parker had any skills or capabilities that were transferable to any light or sedentary job.

New regulations of the Secretary which took effect in February 1979, 20 C.F.R. §§ 404.1502–1513 and Subpart P, App. 2, support the conclusion that Parker should have been awarded benefits. Although these regulations were not in effect at the time of Parker's hearing, their express purpose was "to consolidate and elaborate upon long-standing medical-vocational evaluation policies for adjudicating disability claims," 43 Fed.Reg. 55,349 (1978), and they have been held to apply retroactively to appeals pending at the time of promulgation,[11] *see e. g., Hicks v. Califano*, 600 F.2d 1048, 1050 (4th Cir. 1979). Under these medical-vocational guidelines, a claimant who is over the age of 50, who has a limited or marginal education, and who has work experience consisting either of unskilled jobs or of skilled jobs with no transferable skills, will be considered disabled if his impairment limits him to sedentary work. 20 C.F.R. Subpart P, App. 2, Table No. 1.

---

and experience of ordinary men, and requires no substantiation by a vocational expert." 538 F.2d at 575. In that case, however, the claimant was only thirty years old, was a high school graduate, and, although previously employed as a "general laborer," had had training as an apprentice plumber and carpenter. In addition, the record disclosed the basis for the ALJ's conclusions; he took administrative notice of listings in a state job guide.

**10.** This regulation, promulgated in 1968, was renumbered § 404.1512 in November 1978.

**11.** The Secretary has entered into a stipulation permitting reapplication by claimants over age 45 whose claims were denied based on a failure to meet disability requirements on or after August 20, 1978 or whose claims were pending in federal court on or after October 20, 1978. *Lewis v. Harris*, K–78–1267 (D. Md. Oct. 10, 1979) (order and stipulation). Thus even had we found that the decision here was technically supported by substantial evidence, a remand to the Secretary for reconsideration under the new guidelines might have been warranted. *See, e. g., Hicks v. Califano, supra*, 600 F.2d at 1050.

Viewing the record as a whole, we conclude that the ALJ's determination that Parker was able to perform substantial gainful work in the economy was not supported by any, much less by substantial, evidence.

### III

When there are gaps in the administrative record or the ALJ has applied an improper legal standard, we have, on numerous occasions, remanded to the Secretary for further development of the evidence. *See, e. g., Marcus v. Califano,* 615 F.2d 23 (2d Cir. 1979) (remanded for reconsideration under standard that subjective evidence of disabling pain, if credited, may support a finding of disability); *Cutler v. Weinberger, supra,* 516 F.2d at 1287 (remanded to permit claimant to produce further evidence); *Eiden v. Secretary of HEW, supra* (remanded to require ALJ to permit adequate cross examination). On the other hand, we have reversed and ordered that benefits be paid when the record provides persuasive proof of disability and a remand for further evidentiary proceedings would serve no purpose. *See, e. g., Gold v. Secretary of HEW, supra,* 463 F.2d at 44.

We conclude that no useful purpose would be served here by a remand for the development of further vocational evidence. The Appeals Council, in its letter declining review of Parker's claim, expressed its view that "[f]or the administrative law judge to obtain current vocational testimony on jobs [appellant] could have performed on June 30, 1976 would now be inappropriate."

Accordingly, we reverse and remand to the Secretary for calculation and payment of benefits.