Suzette LEONOVICH, Plaintiff,

v.

Jo Ann B. BARNHART, Commissioner of Social Security, Defendant.

No. 02–CV–6228–CJS.

United States District Court, W.D. New York.

Feb. 26, 2003.

Andrew M. Rothstein, Esq., Elmira, for the Plaintiff.

Michael A. Battle, United States Attorney, By Brian M. McCarthy, Assistant United States Attorney, Rochester, for the Defendant.

DECISION AND ORDER

SIRAGUSA, District Judge.

## I. INTRODUCTION

Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) to review the final determination of the Commissioner of Social Security ("Commissioner") who denied her application for disability benefits. Before the Court is the Commissioner's motion (docket # 3) seeking an order reversing her decision and remanding the case, pursuant to sentence four of § 405(g), for further hearings, and plaintiff's motion (docket # 5) for summary judgment, seeking a reversal of the Commissioner's deci-

sion and a remand for calculation of benefits only. For the reasons stated below, the Court grants plaintiff's motion and remands the case pursuant to sentence four of § 405(g) for calculation of benefits only.

## II. PROCEDURAL BACKGROUND

Plaintiff filed an application for disability insurance benefits on October 21, 1997, alleging she was disabled as of November 19, 1996, as a result of problems with her hands. The Commissioner denied her application initially and on reconsideration. Plaintiff then filed a request for a hearing before an Administrative Law Judge ("ALJ") and the hearing was held on October 9, 1998. The ALJ issued a written decision on May 24, 1999, finding that plaintiff was not disabled, and that she retained the residual functional capacity to perform sedentary work. The ALJ's decision became the Commissioner's final decision when the Appeals Council denied Plaintiff's request for review on March 8, 2002. Plaintiff commenced this civil action on April 22, 2002.

## III. PLAINTIFF'S WORK HISTORY

Plaintiff was born on August 23, 1961. She is a high school graduate who also earned a teaching assistant certificate from Corning Community College. From 1979 to 1984, plaintiff worked as a sales clerk and bookkeeper at a Sears Catalogue Store. She then from September, 1981[1] to November 18, 1996, worked as a teaching assistant, first at Bradford Central School, then at Bath Central School.

## IV. MEDICAL HISTORY

Plaintiff reports that she was injured at work on February 5, 1996, when she tried

---

1. In her testimony before the ALJ, plaintiff stated that she initially injured herself on February 5, 1996, and returned to work with a cast on her right arm, did not work during the summer break, and returned to work again on September 3, 1996, when school opened, but discontinued working altogether on November 18, 1996.

to keep a magazine holder from falling, with resulting injury to her right wrist and thumb. R. at 241. That evening, she put ice on her injured wrist and thumb, then returned to work the next day. The pain continued, so she visited her family physician, Dr. Eric Phillips.

On February 8, 1996, Dr. Phillips diagnosed wrist pain and, for a treatment plan, wrote, "cock up splints . . . Advil . . . x-ray tonight." R. at 22. Plaintiff continued to see Dr. Phillips every two to four weeks and, on July 9, 1996, plaintiff underwent an electromyogram ("EMG") of her hands at Dr. Phillips' direction. The examining neurologist, Dr. Paul Buckthal, wrote that plaintiff appeared to be suffering from either de Quervain's Syndrome [2], or disruption of the carpal metacarpal joint capsule. R. at 263–64.

On July 25, 1996, plaintiff was evaluated at the Hand Management Center of St. Joseph's Hospital in Elmira, New York, by Jill Townsend, PT, CHT. Ms. Townsend wrote in her assessment that plaintiff's problems included significant pain, swelling and diminished range of motion of the right thumb resulting in decreased ability to incorporate that hand into functional activities of daily living. She instructed plaintiff on the use of heat and cold, and fitted her with a spica [3] splint with the goal of resting the joints and tendons, thereby reducing pain and edema [4]. Plaintiff then began a course of physical therapy and experienced some improvements. R. 158–59. As of September 9, 1996, Ms. Town-

send noted that plaintiff had returned to work and that she was managing, although she noted some increase in plaintiff's symptoms. R. at 161. Plaintiff was fitted with another spica splint in October 1996, with the result that her pain decreased and mobility increased. R. at 163.

On November 19, 1996, plaintiff left work due to pain in her left elbow. Plaintiff continued physical therapy and after fifteen physical therapy visits, Kimi Archer, MSPT [5] at Ira Davenport Memorial Hospital in Bath, New York, concluded in a report dated March 6, 1997, that plaintiff, "had not received any significant improvement in her hand function and did have continued reports of pain specifically after being seen by three doctors prior to her last apt. [sic.]" R. at 166.

As a result of being right-handed, plaintiff had relied on her left arm more when her right arm became sore, resulting in injury to her left elbow. R. at 43. As a result of her left elbow injury, plaintiff increased the use of her right arm, which led to increased pain in her right thumb and wrist. R. at 164. In his examination notes of November 18, 1996, Dr. Phillips wrote that plaintiff was totally disabled. R. at 236.

In December 1996, plaintiff began another course of physical therapy at Ira Davenport Memorial Hospital. She attended a few appointments, but experienced continued pain. R. at 166. She saw Dr. Steven Garner, an orthopedic surgeon, on January 30, 1997. Dr. Garner found a

---

**2.** This disorder is also known as "washerwoman's sprain," and usually occurs after repetitive use (especially wringing) of the wrist, although it is occasionally associated with rheumatoid arthritis; diagnosis is highly suggested by the Finkelstein test. The Merck Manual (17th ed.) At 496.

**3.** A bandage that is applied in successive V-shaped crossings and is used to immobilize a

limb, especially at a joint. Merriam Webster's Medical Desk Dictionary (1993) at 667.

**4.** Abnormally excessive accumulation of tissue fluid. Merriam Webster's Medical Desk Dictionary (1993) at 200.

**5.** These initials are not identified in the report.

positive Finkelstein[6] test on the right, with some discomfort of the thenar eminence, ulnar area and MP joint. He reported that plaintiff's left wrist was tender, had a positive Tinel's sign[7] and had decreased sensation along the ulnar nerve distribution. Dr. Garner thought plaintiff might have de Guervain's [sic][8] and ulnar neuropathy of the left hand. He wrote in a January 30, 1997, letter to Dr. Phillips that, "the hope for a resolution may be somewhat grim." R. at 178.

In connection with her workers' compensation claim, Dr. John S. Forrest evaluated plaintiff on January 29, 1997. R. at 154. She complained of bitter pain in her right hand and at the base of her thumb, with shakiness of the hands. He noted that her left hand had tingling on the outer fingers which sometimes radiated up to her elbow. Plaintiff told Dr. Forrest that she could not wash, do her dishes, clean, or lift, and that she spent her time sitting and reading. R. at 155.

Dr. Forrest reviewed x-rays taken in February and December 1996 and noted that plaintiff appeared in considerable pain, crying with ordinary hand movements. He observed swelling and tenderness of the right carpometacarpal joint of her thumb, and positive Tinel's and Phalen's[9] signs by her right elbow. He noted the following: her hand grip was reduced bilaterally, with only seven pounds on the right, and fifteen pounds on the left; and

her side pinch grip was also reduced, at two pounds on the right and four pounds on the left. On her left wrist and elbow, he remarked there was a positive Tinel's sign, but a negative Phalen's sign. Dr. Forrest diagnosed plaintiff as having a probable marked sprain of the MP and CMP (carpometacarpal) joints. He also wrote that there was ulnar nerve neuritis of her left elbow and wrist, possibly due to overuse. R. at 154–57. Dr. Forrest considered plaintiff to have a "marked temporary partial" disability. R. at 157.

On March 11, 1997, plaintiff was again evaluated by Ms. Townsend at St. Joseph's Hospital. R. at 167–69. Although, Ms. Townsend observed that plaintiff's right thumb was not swollen, she did make a number of abnormal findings. She found the range of motion of plaintiff's right thumb was only 60% of that of the left thumb, and that plaintiff's right hand grip and pinch strength were only 30% to 50% of her left hand. Ms. Townsend also found palpable tenderness of some of the hand joints, and that the Phalen's sign (used to test for carpal tunnel syndrome) was positive bilaterally, as was the Tinel's test over the ulnar nerve at plaintiff's wrist and elbow. R. at 167–69.

On May 13, 1997, plaintiff saw Dr. Russell J. Striff, Jr., an orthopedic surgeon. R. at 170–72. She complained to him of having constant pain in her left hand, tin-

6. In this test, the patient is asked to adduct the thumb on the involved side into the palm and to wrap the fingers over the thumb. Passive movement at the wrist is performed in all ranges of motion, and if forcible ulnar deviation of the wrist provokes severe pain at the site of the affected tendon sheaths, then the test is considered positive. The Merck Manual (17th ed.) at 496.

7. A tingling sensation felt in the distal portion of a limb upon percussion of the skin over a regenerating nerve in the limb (from Jules

Tinel, French neurologist). Merriam Webster's Medical Desk Dictionary (1993) at 719.

8. This is probably a typographical error and was meant to refer to de Quervain's syndrome.

9. Also known as the wrist flexion test. Frank L. Urbano, M.D., *Tinel's Sign and Phalen's Manuever: Physicial Signs of Carpal Tunnel Syndrome*, HOSPITAL PHYSICIAN, July, 2000 at 39–44. See also, The Merck Manual (17th ed.) at 1491.

gling in her left elbow and constant pain in her right thumb. Plaintiff also spoke of pain in both arms. Dr. Striff found that plaintiff's range of motion in both thumbs was normal, and an EMG was also normal. Dr. Striff's findings included right trigger thumb by history[10], left ulnar nerve entrapment, and fibromyalgia of the arms. Dr. Striff thought plaintiff's problems would not be resolved with surgery, and thought she would be better off seeing a rheumatologist, recommending Dr. Kenneth Gold. He also opined that,

> [s]he is disabled from her regular job. The temporary restrictions have to do with power grasp and lifting, carrying, pushing or pulling more than five pounds. There will almost certainly be permanent restrictions and the restrictions will almost certainly be severe.

R. at 172.

Pursuant to Dr. Striff's suggestion, plaintiff was seen by Dr. Kenneth Gold, a rheumatologist, on May 28, 1997. R. at 173–76. Plaintiff told Dr. Gold that she was no longer able to do her housework. She complained of numbness and tingling in her fourth and fifth fingers. Dr. Gold found that her right thumb was tender even to light touch. Dr. Gold also found that plaintiff's grip strength was markedly decreased on the right side, and that she experienced mild discomfort during movement of her wrists. However, Dr. Gold, disagreed with Dr. Striff, and ruled out nerve entrapment and fibromyalgia. He diagnosed plaintiff as suffering from myofascial pain disorder. Dr. Gold wrote in his May 28, 1997 report that,

> [p]rognosis at this point is quite poor as symptoms have been present 15 months. She has been off work now for six months without any significant improvement... Prognosis of this is quite poor.

I think that the likelihood of her benefitting from vocational rehab is quite limited given the fact that both upper extremities are inoperable and she would be unable to do any type of sedentary or manual labor with her current problem....

R. at 175–76.

Subsequently, in a June 9, 1997, letter, Dr. Gold wrote that although he had permitted plaintiff to return to work, that decision was based on false information. He stated that because he was told by the Workers' Compensation carrier that plaintiff was willing to return, and that her employer would take her with her restrictions, he did not consult with plaintiff before permitting her to return to work. He also stated in the letter,

> *I evaluated [plaintiff] only for the question as to whether or not she had fibromyalgia.* I am not involved in her ongoing care regarding her musculoskeletal pain problem and do not feel that I am at liberty to be issuing work restrictions, etc. I defer to Dr. Eric Phillips who is seeing her on an on-going basis with respect to this.

R. at 177 (emphasis in original).

On June 2, 1997, plaintiff returned to orthopedic surgeon Dr. Garner. He injected her thumb area, apparently with an anti-inflammatory. However, plaintiff developed an inflammation from the injection and was placed in a splint. R. at 181–82.

Plaintiff saw Dr. Forrest again on June 26, 1997. She spoke of right thumb pain which radiated down her forearm, as well as tingling in the fingers of her left hand. R. at 187–87. Dr. Forrest examined plaintiff, finding pain in her right thumb, a positive Tinel's sign by the left wrist and elbow, and a positive Phalen's sign on the left ulnar nerve. He also observed that

---

**10.** Dr. Striff indicated that this finding was based on the patient's history.

plaintiff was hypersensitive using her hands. Dr. Forrest's findings were unchanged from January 1997. He wrote in a report dated June 26, 1997, that plaintiff had a marked temporary partial disability and was capable only of very light activity. He wrote,

> [s]he should be able to sign individuals in and out, stamping with or without her splint, able to answer phone, monitor cafeteria, limited lifting 5# or less as suggested by Dr. Striff which would include one book at a time but should not carry heavy books in either arm and not keep her arms in prolonged flexion particularly on the left.

R. at 186–87.

On September 23, 1997, plaintiff underwent a functional capacity assessment by Lisa Wheeler, a Physical Therapy Assistant at Corning Hospital. R. at 188–92. Ms. Wheeler performed a variety of tests, which caused throbbing, tingling pain and soreness. Ms. Wheeler wrote in a Functional Assessment Overview that plaintiff could do the following:

|  | Occasionally | Frequently |
| --- | --- | --- |
| Lift above shoulder level | R 1#, 1 1#, B 6# | R 1#, L, 1#, B6# |
| Lift from desk to chair | R 2#, L 2#, B 8# | R 2#, L 1#, B 8# |
| Lower from chair to floor | R 2#, L 2#, B 8# | R 1#, L 2#, B 8# |
| Push | Bilaterally 6.5# | Bilaterally 6.5# |
| Pull | R 2#, L 2# | R 2#, L 2# |

R. at 191.

Dr. Forrest examined plaintiff for a third time on December 4, 1997. R. at 193–97. Plaintiff reported that her condition was not improved, despite wearing her splints day and night. She complained of continued pain in her right thumb, some tingling by the tip of her right thumb and two outer fingers, as well as some tingling from her left elbow down to the two outer thumbs. Plaintiff related that even so simple an activity as stirring would bring on pain and swelling. Dr. Forrest found that her grip and pinch strength continued to be markedly low bilaterally, more so on the right, and he also found a decrease in sensation in the left wrist along the ulnar nerve distribution. Dr. Forrest's opinions remained consistent. He did not consider plaintiff capable of returning to being a teacher's assistant and found she had a marked partial degree of disability. Dr. Forrest closed his written report by stating that plaintiff was "so limited with constant splinting that work activities of any nature appear thwarted.... [Plaintiff], under her present treatment regime, is headed towards long term crippling, and a change of evaluation and treatment is indicated, in my opinion." R. at 197.

On December 4, 1997, plaintiff returned to the Hand Management Center for evaluation. She reported that the June 1997 injection by Dr. Garner did not bring about improvement, and complained she had persistent right thumb pain and some tingling in both hands. R. at 198. She also stated that despite using the splints, she had problems writing as well as with heavier gripping activities, with occasional tingling in the tip of her thumb. Plaintiff was again seen by Ms. Townsend who wrote in her report, dated December 10, 1997, that she found "pain and laxity upon stress to the ulnar collateral ligament of

the right MP joint and significant palpable tenderness over the CMC joint trapezium and to a lesser extent scaphoid region." R. at 199–200. Ms. Townsend also found that on the left side, plaintiff, "has strong provocative tests ie [sic] Tinel's and Phalen's over median and ulnar nerves. Her strength is generally decreased for a female of this age on this side." R. at 200. Overall, Ms. Townsend's findings changed little from March 1997. R. at 199.

Dr. Wesley Canfield, a physician selected by the Commissioner, saw plaintiff on December 17, 1997. R. at 201. In a written report, Dr. Canfield wrote that plaintiff reacted with pain at any movement of her hands or forearms. R. at 202. He also indicated that her grip strength bilaterally was 4/5, but she complained of discomfort at the extremes dorsiflexion and plantar flexion. He noted that she could not oppose her right thumb to the base of her fifth digit. R. at 203. He also found that the Tinel's sign was positive bilaterally and there was ulnar nerve tenderness. In addition, he determined there were myofascial trigger points in the head, neck and trapezius. Dr. Canfield's diagnosis was bilateral carpal tunnel, overuse syndrome of the forearms and hands and myofascial pain. He wrote that plaintiff could not return to her former job. Dr. Canfield found that plaintiff's prognosis was guarded and concluded that she was limited dramatically in her activities of daily living. R. at 203–04.

Plaintiff was then referred to Dr. Daniel Britton, a neurologist, who examined her on April 22, 1998. By this time, plaintiff's symptoms were similar in both hands. Dr. Britton performed nerve conduction and EMG tests. Both of these tests were normal. Dr. Britton was unsure as to the exact cause of the plaintiff's problem, but thought her condition might be helped by therapy on plaintiff's neck and shoulders and consequently, he referred her to a physical therapist, Cathleen Anderjack. R. at 289–93.

Cathleen Anderjack evaluated plaintiff on July 6, 1998, and wrote, in her Physical Therapy Initial Evaluation report, that plaintiff had a more severe pain response with extension, rotation and side bending to the right. R. at 266–68. During manual muscle testing to plaintiff's bilateral upper extremities, she noted functional limitations, except for wrist flexion, finger abduction and abduction. Ms. Anderjack wrote that plaintiff was able to oppose her fingers, with a struggle, and, "pain response is noted to a more severe degree with extension, rotation and side bending to the right." R. at 267. In the assessment portion of her report, Ms. Anderjack wrote,

[p]atient presents with significant disability and dysfunction about the cervical area and bilateral upper extremities. Cervical involvement has not been diagnostically confirmed however, bilateral disability in both hands relating to digits four and five with pain in paresthesia, indicate central cervical involvement. This patient is also unable to perform cervical extension without exquisite painful repercussions, translating into migraine type headaches.

R. at 267. Plaintiff underwent twenty-four physical therapy sessions with Ms. Anderjack. The progress notes concentrated far more on plaintiff's neck and shoulders than her hands or wrists. R. at 269–77. In a September 21, 1998, discharge note, Ms. Anderjack wrote that plaintiff had a complete and thorough understanding of exercise needs with pictorial guides for a home program. However, the report also indicates that plaintiff continued to experience myofascial pain. R. at 277.

On October 9, 1998, shortly after her physical therapy had ended, plaintiff ap-

peared for a hearing before the ALJ. Plaintiff testified that she had continual, severe pain and periodic numbness in her hands. She stated that when using her hands, they swelled. R. at 49. She indicated that she had been taking anti-inflammatories to cope with pain, but stopped due to stomach problems. R. at 46. Plaintiff testified that the pain from her right shoulder to her neck was, "[l]ike a knife. Like right now it's got a severe burning sensation." R. at 51. She also testified that the pain in her left shoulder was the same. R. at 51, 62. She stated that she had stopped washing dishes, because she had broken too many of them. She further stated that her daughter usually did the laundry and the cooking. Additionally, plaintiff related that she could read for only a short time due to her difficulty in holding books. R. at 56. She also testified that it was also hard to write. R. at 63.

From 1996 through 1998, plaintiff continued to see Dr. Phillips on a monthly basis. Dr. Phillips' office notes for December 2, 1996; January 3, 1997; January 30, 1997; February 24, 1997; March 26, 1997; April 29, 1997; May 28, 1997; June 26, 1997; July 29, 1997; August 25, 1997; September 24, 1997; October 27, 1997; November 21, 1997; December 22, 1997; and January 21, 1998, show that plaintiff was totally disabled. In his office notes of March 18, 1998, Dr. Phillips wrote, "Pt. has marked degree of permanent disability [illegible] B/C UE (wrist/Elbows/Hands)." R. at 259. However, in his report dated April 22, 1998, Dr. Phillips wrote that plaintiff had a marked partial disability. R. at 260. Dr. Phillips listed a diagnosis of overuse syndrome and classified plaintiff as being partially disabled through his last progress note, dated September 23, 1998. R. at 280–84.

Dr. Phillips provided even greater detail on plaintiff's limitations in the work assessment form he completed on September 28, 1998. He wrote that plaintiff was limited to occasional lifting or carrying of two pounds with each arm. He also stated that plaintiff's ability to sit and stand were not limited, other than the need for periodic breaks, ruled out climbing and crawling, and found plaintiff's capacity for reaching, handling, feeling, pushing and pulling to be limited. Dr. Phillips closed by writing that plaintiff had "marked limitation of the use of both hands." R. at 285–88.

Dr. Phillips referred plaintiff to Dr. Dawn M. Heil, a plastic surgeon. In her February 16, 1999 report, Dr. Heil wrote that plaintiff's right thumb ached with even light duty, that her hands became ice cold and swollen with dusting, even if she used her splints. Dr. Heil also noted that plaintiff had a maximum strength of one pound bilaterally in her hands and six pounds bilaterally in her shoulders. She concluded by writing, "I completely concur with Dr. Ross's assessment in that she is significantly impaired and should be considered to have marked permanent disability for use of bilateral upper extremities." R. at 294.

## V. DISCUSSION

### A. THE STANDARD OF REVIEW

The issue to be determined by this Court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard." *Schaal v. Apfel,* 134 F.3d 496, 501 (2d Cir.1998). It is well settled that

it is not the function of a reviewing court to determine *de novo* whether the claimant is disabled. Assuming the Secretary [Commissioner] has applied proper legal principles, judicial review is limited to an assessment of whether the findings of

fact are supported by substantial evidence; if they are supported by such evidence, they are conclusive.

*Parker v. Harris,* 626 F.2d 225, 231 (2d Cir.1980). Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* at 231–32. Where there are gaps in the administrative record or where the Commissioner has applied an incorrect legal standard, remand for further development of the record may be appropriate. *Id.* at 235. However, where the record provides persuasive proof of disability and a remand would serve no useful purpose, the Court may reverse and remand for calculation and payment of benefits. *Id.*

### B. THE STANDARD FOR FINDING A DISABILITY

For purposes of the Social Security Act, disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." Social Security Act § 223(d)(1)(A), 42 U.S.C. § 423(d)(1)(A); *Schaal,* 134 F.3d at 501. The Social Security Administration ("SSA") has promulgated regulations which establish a five-step sequential analysis an ALJ must follow:

First, the SSA considers whether the claimant is currently engaged in substantial gainful employment. If not, then the SSA considers whether the claimant has a "severe impairment" that significantly limits the "ability to do basic work activities." If the claimant does suffer such an impairment, then the SSA determines whether this impairment is one of those listed in Appendix 1 of the regulations. If the claim-

ant's impairment is one of those listed, the SSA will presume the claimant to be disabled. If the impairment is not so listed, then the SSA must determine whether the claimant possesses the "residual functional capacity" to perform his or her past relevant work. Finally, if the claimant is unable to perform his or her past relevant work, then the burden shifts to the SSA to prove that the claimant is capable of performing "any other work."

*Schaal,* 134 F.3d at 501(citations and internal quotation marks omitted).

### C. THE ALJ'S DECISION

The Administrative Law Judge issued his decision on May 24, 1999, finding that plaintiff was not entitled to disability insurance benefits under Social Security Act §§ 216(i) and 223. Applying the sequential evaluation process, the ALJ found, at step one, that plaintiff had not engaged in substantial gainful activity since November 19, 1996, the date she states she became disabled. At step two, he found medical evidence established that plaintiff had severe impairments, however, at step three, the ALJ found that they did not meet the listings, or have impairments of a nature nor were they medically equal to the listings, in appendix 1, subpart P., regulations No. 4.

At step four, the ALJ found plaintiff was unable to perform her past relevant work as a teaching assistant, sales clerk, or bookkeeper. At step five, the ALJ determined that plaintiff's residual functional capacity for the full range of sedentary work was reduced by her inability to lift, push, or pull more than two pounds, reach above her head more than occasionally, or sit more than thirty minutes at a time. However, in this regard, the ALJ discredited plaintiff's allegations of disabling symptoms and limitations, including pain.

He found she had the residual functional capacity to perform the physical exertion requirements of sedentary work except for lifting, pushing, or pulling more than two pounds; reaching above her head more than occasionally; or sitting for more than 30 minutes at a time. He also found there were no nonexertional limitations. R. at 29.

In an undated letter, the ALJ provided hypotheticals based on plaintiff's situation to a vocational expert and asked the expert to identify any jobs plaintiff would be capable of performing. R. at 144–46. In his letter, the ALJ wrote:

Assume a 37–year–old female claimant, having graduated high school and taken two courses at Corning Community College so as to obtain a teaching assistant certificate. Further assume this claimant's employment history is as follows: 1. September 1979–February 1984: Salesclerk/bookkeeper at Sears Factory Store, duties including daily cost report, deposits, taking telephone orders and waiting on customers. This job entailed walking four hours each day, sitting two hours, standing two hours, constant bending and lifting between 25–50 lbs. 2. February 1990–June 1993: teaching assistant at Bradford Central School, Where claimant helped with computers and helped students with their class work. Exertionally this entailed walking one hour per day, standing three hours, sitting four hours, frequent bending and lifting 10–20 lbs. 3. December 1993–November 18, 1996, teaching assistant in the library at Haverling High School, which entailed supervising students, computer work, shelving books and inventory. Exertionally, assume claimant walked two hours per day, stood three hours, sat three hours, constantly stooped and lifted 25–50 lbs. Assume for purposes of this hypothetical, claimant cannot return to her past

relevant work if, for no other reason, the lifting requirements.

Assume that claimant injured her right thumb and adjacent tendons in November 1996. Shortly thereafter, she was prescribed a splint for the right wrist which she continues to wear. Basically, she experiences some thumb pain and finds the thumb difficult to bend. Assume claimant is right-hand dominant and is barely able to write a note of a dozen or so words. Further, assume that claimant has developed an overuse syndrome with the left wrist, necessitating wearing a splint full time. Also, assume some tingling and numbness in the fourth and fifth fingers of the left hand is experienced.

Assume that claimant is able to sit eight hours in an eight-hour day and stand eight hours, assuming in both instances that she would be accorded normal breaks. Additionally, assume that claimant can lift but two lbs., can stoop frequently, and would be limited in reaching above her head and limited in push/pull (presumably to two lbs.).

1. Based upon the foregoing, considering claimant's age, education, work experience and limitations, is claimant able to return to any of her past relevant work as it is normally done in the Hammondsport area of New York State and/or other regions in the national economy?

2. Based upon the foregoing, considering claimant's age, education, work experience and limitations, are there jobs existing in the Hammondsport area of New York State and/or other regions in the national economy which claimant can do?

3. Considering the claimant's age, education, work experience and limitations, and assuming the only change in the above-mentioned exertional abilities

would be that she can sit no more than 30 minutes at one time (without having to stand or walk), are there jobs existing in the Hammondsport area of New York State and/or other regions in the national economy which claimant can do?

R. at 144–45. When notified of the letter action, plaintiff's counsel objected, R. at 147, citing Social Security Ruling ("SSR") 96–9p, page 5 which, he pointed out, states as follows:

> If an individual is unable to lift 10 pounds or occasionally lift and carry items like docket files, ledgers, and small tools throughout the workday, the unskilled sedentary occupational base will be eroded. The extent of erosion will depend on the extent of the limitations. For example, if it can be determined that the individual has an ability to lift or carry slightly less than 10 pounds, with no other limitations or restrictions in the ability to perform the requirements of sedentary work, the unskilled sedentary occupational base would not be significantly eroded; however, an inability to lift or carry more than 1 or 2 pounds would erode the unskilled sedentary occupational base significantly. For individuals with limitations in lifting or carrying weights between these amounts, consultation with a vocational resource may be appropriate.

SSR 96–9p. SSR 96–9p also states that "a finding of 'disabled' usually applies when the full range of sedentary work is significantly eroded . . . ." *Id.*

Julie Andrews, MPA, CRC, ABDA, CCCJS, Vocational Expert, responded in a letter dated March 1, 1999. R. at 149–51. Ms. Andrews stated that such an individual could not do her past relevant work, but could do one of the following jobs:

| | |
|---|---|
| Information Clerk | DOT number 237.367–022 |
| Order Clerk, Food & Beverage | DOT number 209.567–0 14 |
| Surveillance System Monitor | DOT number 379.367–0 10 |

The ALJ ruled out the order clerk job, but held that plaintiff was not disabled, as she could perform the functions of the information clerk and surveillance system monitor positions. R. at 28–29.

### D. ANALYSIS

The Commissioner, in her motion for remand, argues that the ALJ did not evaluate evidence that plaintiff had greater functional limitations, including manipulative limitations, as a result of her alleged impairments. She states that Dr. Phillips, plaintiff's treating physician, opined that plaintiff was limited in reaching, handling, and feeling, but that the ALJ appeared to adopt only the portion of the doctor's opinion that plaintiff could lift a maximum of two pounds, and failed to reconcile the doctor's finding of manipulative limitations. She asserts this was improper under *Fiorello v. Heckler,* 725 F.2d 174, 176 (2d Cir.1983) (ALJ may not "pick and choose" those excerpts of the medical reports that supported a denial of benefits). Further, the Commissioner argues that Dr. Kenneth Gold, also an examining physician, opined that plaintiff could not do "any type of sedentary or manual labor with her current problem." R. at 176. Finally, she points out that Dr. John S. Forrest, another examining physician, reported that plaintiff underwent a functional capacity evaluation that showed she could do "very little," R. at 194, and that "at the present time she is so limited with

constant splinting that work activities of any nature appear thwarted." R. at 197. The Commissioner argues that the ALJ did not address this statement, or reconcile it with his finding that plaintiff could do a limited range of sedentary work. Notwithstanding these arguments, however, the Commissioner also contends that the record, as it presently stands, does not contain evidence which would clearly support a finding that plaintiff is disabled. On the other hand, while plaintiff concurs that remand is proper, she maintains it should be for the calculation of benefits only.

Plaintiff's first argument in support of her position, that SSR 96–9p restricts the ALJ from calling a vocational expert in this case, is not persuasive. The plain language of the ruling suggests that for individuals for whom lifting, carrying, pushing, and pulling is limited between ten and two pounds, consultation with a vocational resource *may* be appropriate. That language does not suggest that it would be inappropriate to consult with a vocational expert when an individual is limited to carrying no more than one or two pounds. Thus, the court concluded that plaintiff's argument on this point is not a basis for reversal or remand in this case.

Next, plaintiff contends that the ALJ improperly evaluated the medical evidence in the record and that such evidence establishes that plaintiff is disabled. The Commissioner's regulations addressing the weight to be given a medical opinion provide in pertinent part:

(d) *How we weigh medical opinions.* Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.

(1) *Examining relationship.* Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.

(2) *Treatment relationship.* Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

(i) *Length of the treatment relationship and the frequency of examination.* Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment,

we will give the source's opinion more weight than we would give it if it were from a nontreating source.

(ii) *Nature and extent of the treatment relationship.* Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories. For example, if your ophthalmologist notices that you have complained of neck pain during your eye examinations, we will consider his or her opinion with respect to your neck pain, but we will give it less weight than that of another physician who has treated you for the neck pain. When the treating source has reasonable knowledge of your impairment(s), we will give the source's opinion more weight than we would give it if it were from a nontreating source.

(3) *Supportability.* The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion. Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions. We will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources.

(4) *Consistency.* Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(5) *Specialization.* We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

20 C.F.R. § 404.1527(d)(1)-(5).

Based on the above regulation, clearly Dr. Phillips' and Dr. Gold's opinions should carry great weight in this case. Although the Commissioner relies on contrary medical evidence in the record, that evidence does not come from treating sources and, thus, is not accorded the great weight that the treating physicians' evidence is under this regulation. For example, the Commissioner relies in part on the opinion of Dr. Judith Rodnar, a state agency physician who never examined plaintiff. R. at 205–12. However, the Court determines that Dr. Rodnar's findings, "that plaintiff was able to lift 50 pounds occasionally and 25 pounds frequently, are so grossly different from the opinions of all examining physicians and medical evidence that they deserve no consideration in this case." Pl.'s Mem. Supp. Mot. Summ. J. at 16.

Likewise, the opinion of Dr. J. Randall (his first name it is not shown on the physical residual functional capacity assessment form), also relied on by the ALJ, states limitations in lifting that are far beyond those given by the treating and examining physicians. R. at 213–20. Dr. Randall's report also mentions plaintiff's complaint of tingling in both hands, the fact that she wears wrist splints, that her right grip strength is five pounds and her left grip strength is twelve, and that she has a positive Tinel's sign on her right and left sides. His conclusion, that she is capable of performing light work not requiring constant repetitive motion of her hands, or involving fine manipulation, is not supported by the evidence in the record before this Court. The Court also

**212**

finds it significant that the ALJ chose to ignore Dr. Randall's and Dr. Rodnar's findings with regard to plaintiff's ability to lift weights.

■ Based on its thorough review of the record in this case, the Court finds that the Commissioner's final decision is not supported by substantial evidence in the record. *Parker v. Harris,* 626 F.2d 225, 231 (2d Cir.1980). It is clear from the treating physicians' reports that plaintiff has tried just about every avenue for relief offered by the medical profession, all without success. The record as it now stands provides persuasive proof of disability and the Court concludes that a remand for further deliberations would serve no useful purpose; therefore, the Court reverses the Commissioner's decision, and remands solely for calculation and payment of benefits. *Id.*

### III. CONCLUSION

Accordingly, the Commissioner's motion for reversal of the Commissioner's decision and remand for further consideration (docket # 3) is granted in part, denied in part, and plaintiff's motion for summary judgment (docket # 5), reversing the Commissioner's decision and remanding the case, pursuant to sentence four of 42 U.S.C. § 405(g), solely for calculation and payment of benefits, is granted.

IT IS SO ORDERED.