Jonathan E. ELDRED, Plaintiff,

v.

COMMISSIONER OF SOCIAL SECURITY, Defendant.

No. 01–CV–6324 CJS.

United States District Court, W.D. New York.

March 6, 2003.

Grover T. Odenthal, Esq., Watkins Glen, NY, for the Plaintiff.

Kathleen M. Mehltretter, United States Attorney, By Brian M. McCarthy, Assistant United States Attorney, Rochester, NY, for the Defendant.

DECISION AND ORDER

SIRAGUSA, District Judge.

## I. INTRODUCTION

Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) to review the final determination of the Commissioner of Social Security ("Commissioner") who denied his application for disability benefits. Before the Court is the Commissioner's motion for judgment on the pleadings (document # 12) seeking an order affirming the Commissioner's decision and plaintiff's response. For the reasons stated below, the Court grants the motion.

## II. PROCEDURAL BACKGROUND

Plaintiff applied for Social Security disability insurance benefits on October 5, 1998. The application was denied initially and upon reconsideration. Plaintiff then requested a hearing by an administrative law judge ("ALJ"). The hearing was held on September 20, 2000. On January 5, 2001, the ALJ found that plaintiff was not under a disability. The Appeals Council declined plaintiff's request for review, thereby making the ALJ's decision the final decision of the Commissioner. Plaintiff then commenced this action.

The Commissioner filed her motion for judgment on the pleadings on May 8, 2002, and the Court issued a motion scheduling order setting July 12, 2002, as the date by which plaintiff *pro se* was to respond to the motion. On September 19, 2002, the Court received a letter from Grover T. Odenthal, Esq., asserting that he had been retained by plaintiff and requesting an extension of the time within which to file a response to the Commissioner's motion. The Court entered an Order on September 23, 2002, granting the extension. Mr. Odenthal filed a response on October 8, 2002, which the Court has considered in arriving at its decision.

## III. PLAINTIFF'S NONMEDICAL INFORMATION

Plaintiff was born on February 12, 1953. He obtained a general equivalency diploma and attended community college for two years. Since 1982, plaintiff held positions as a mechanic, truss builder, and dry waller. Most recently, from April 1991 through May 1998, he drove a fork lift and sorted and moved wood. All of plaintiff's jobs required that he lift 100 pounds.

Plaintiff lives at home with seven children, ages three through sixteen. Plaintiff stated that he could cook, sweep and walk. His recreational activities included fishing and walking. He drove on a daily basis. He maintained social contacts. At the ALJ hearing, plaintiff stated that he only occasionally drove. He confirmed that he did chores around his home, such as washing dishes or doing laundry, but stated that he primarily watched television. Plaintiff testified that he had chest and back pain and was depressed.

## IV. MEDICAL HISTORY

Plaintiff suffered a heart attack on November 21, 1997, and was admitted to Arnot Ogden Medical Center. Plaintiff underwent cardiac catheterization, angioplasty, and placement of a stent and intra-aortic balloon. Post-surgicaily, a Persantine thallium test revealed no infarct or ischemic. Plaintiff was discharged on November 27, 1997. He was given prescriptions for Ecotrin, Ticlid, Zocor, Toprol and Colchicine. He was told to limit himself to moderate ambulation and not to return to work until medically cleared.

On December 18, 1997, Dr. Paul Hicks, a cardiologist, saw plaintiff for a cardiac evaluation. Plaintiff's blood pressure was 113/82, and his weight was 216 pounds. His neck was unremarkable, and his chest was clear to auscultation. Plaintiff's heart had a regular rate and rhythm with normal S1 and S2. Dr. Hicks diagnosed status post anterior wall myocardial infarction with stent placement and hypercholesterolemia. Plaintiff was to undergo complete blood count and a treadmill test to evaluate atypical chest discomfort.

On December 22, 1997, plaintiff was admitted to Arnot Ogden Medical Center with complaints of chest discomfort. Dr. Hicks ruled out myocardial infarction and an electrocardiogram was unremarkable. Dr. Hicks noted that plaintiff's left ventricular function was well preserved and that he had had only very mild anterior wall hypokinesis. Dr. Hicks suspected gastrointestinal etiology as the cause of plaintiff's chest discomfort. He discharged plaintiff home on December 24, 1997.

On April 22, 1998, plaintiff underwent an exercise stress test with thallium scan. Dr. Hicks concluded that plaintiff showed, "excellent exercise tolerance for [his] age." R. at 157. Plaintiff exhibited an attenuated heart rate response to exercise, which Dr. Hicks concluded was probably secondary to medication. Plaintiff had a normal blood pressure response to the exercise and experienced no arrhythmias. Dr. Hicks also noted that the test was positive for ST-segment analysis, which did not meet the strict criteria for ischemia, and returned to baseline after approximately one minute in the recovery phase. Plaintiff denied any chest discomfort. The thallium scan was negative.

On May 11, 1998, Dr. Hicks reported that plaintiff was doing well from a cardiac standpoint. He had no chest discomfort. Plaintiff's blood pressure was 122/64 and he weighed 228 pounds. His heart rate and rhythm were regular with normal heart S1 and S2. Plaintiff was taking Zocor, Toprol, Allopurinol and transiderm nitropatch. Dr. Hicks's assessment and plan was to continue plaintiff on beta-blockers, stop the nitrates, and have plaintiff return in one year for another stress test. R. at 160.

On May 13, 1998, Dr. Hicks cleared plaintiff to return to work without any restrictions. Plaintiff attempted to return to work, but his employer refused to accept him back. He looked for other work but was unsuccessful.

Plaintiff had renewed complaints of chest pain in July, 1998. On July 28, 1998, Dr. Hicks assessed unknown etiology of plaintiff's complaints and scheduled a treadmill test with thallium to evaluate his complaints. Dr. Hicks conducted the exercise test on July 30, 1998, and reported that plaintiff had above average exercise tolerance for his age. R. at 163. Plaintiff had a normal heart rate and blood pressure response to exercise, experienced no arrhythmia and the ST-segment analysis was positive and met the criteria for ischemia. Plaintiff experienced mild chest discomfort radiating to his arms. Cardiolite results could not be obtained due to excessive body motion on both the rest and stress phases of the stress test.

On July 31, 1998, a little over two months after he was cleared to return to work, plaintiff was admitted to Arnot Ogden Medical Center for cardiac catheterization. The catheterization revealed a 90% lesion of the right coronary artery. Plaintiff underwent angioplasty and stent placement in the right coronary artery with good result and was discharged on August 2, 1998. Upon discharge, plaintiff was instructed to engage in activities *ad lib*. His medications were Zocor, Ticlid, Ecotrin, Toprol, and Zantac.

On August 13, 1998, Dr. Hicks reported that plaintiff was doing well from a cardiac standpoint. Plaintiff had occasional shortness of breath, but no bilateral arm discomfort. Dr. Hicks assessed status post stent placement to the proximal right coronary artery, status post acute anterior septal wall myocardial infarction in October, 1997, with stent to the left artery, basically normal left ventricular function, which had improved markedly since his first cardiac catheterization, obesity and hypercholesterolemia. Dr. Hicks scheduled a fasting lipid profile and exercise test for October.

On November 10, 1998, plaintiff underwent an exercise test with Dr. Hicks, which revealed excellent exercise tolerance, normal heart rate and blood pressure response to exercise, and no arrhythmias. ST segment analysis met the strict criteria for ischemia, but plaintiff denied chest discomfort. A Thallium scan revealed no abnormalities.

On November 20, 1998, plaintiff again underwent cardiac catheterization with Dr. Hicks. Testing revealed moderate disease involving the proximal left anterior descending artery as well as the right coronary artery and essentially normal left ventricular function with mild anterior wall hypokinesis. Dr. Hicks concluded that plaintiff suffered from moderate disease involving the proximal left anterior descending as well as the right coronary artery, but noted that the circumflex was free of disease. He also found that plaintiff had essentially a normal LV systolic function with mild anterior wall hypokinesis and recommended "aggressive risk reduction for coronary artery disease." R. at 192.

On January 6, 1999, Dr. Wesley Canfield evaluated plaintiff consultatively at the request of the New York State Department of Temporary Disability and Disability Assistance. Plaintiff described having chest pain one to two days per week. He weighed 220 pounds and his blood pressure was 124/90. A resting EKG performed by Dr. Ergun Patel on January 6, 1999, revealed sinus brachycardia within normal limits. Plaintiff's chest was clear to auscultation and percussion. Plaintiff's heart sounds were normal without any murmurs. His peripheral pulses were normal and Dr. Canfield found no edema or carotid bruits and he diagnosed status post myocardial infarction times one, status post angioplasty with stent placement times two. He believed that plaintiff still had some chest pain, but that plaintiff could do some type of sedentary work that did not involve exertion. R. at 324.

A January 12, 1999, stress test performed by Dr. Dominic Romeo at St. Joseph's Hospital in Elmira was positive for ischemic. Plaintiff experienced chest pain one minute into the test with a heart rate of 142 (77% of maximum). Chest x-rays taken by Dr. Thomas Taylor revealed no evidence of acute cardiopulmonary disease or any significant changes from a prior[1] study. The next day, on January 13, plaintiff was admitted to Arnot Ogden Medical Center for catheterization and balloon angioplasty. Dr. Hicks discharged plaintiff on January 17, 1999, and told him he could engage in activities *ad lib*. Dr. Hicks prescribed Plavix, Ecotrin, Zocor and Toprol.

On February 10, 1999, Edward Foster, D.O.[2], evaluated plaintiff. Plaintiff's chief complaint was post nasal drip and "off and on" back pain. He denied any cardiac pain. Head, eyes, ear, nose and throat examination revealed a right ovoid and

---

1. The date of the prior study is not revealed in the report. R. at 211.

2. Doctor of Osteopathy

distorted pupil secondary to trauma. The left pupil was responsive to light. A Fundal examination showed frontal discs which were flattened without deformity. The external ocular muscles were intact. Nasal mucosa was somewhat retracted and pale. There was no edema of the extremities. Hands showed no palmar erythema, splinter hemorrhages or clubbing. There was no cyanosis. Radielis and brachialis pulses were 2/4. There were 1/4 popliteal and dorsalis pedis pulses. There was no deformity or limits of flexibility of the ankles, knees, hips wrist, elbows, shoulders. Plaintiff was missing the terminal portion of his right middle finger. Plaintiff was alert and oriented, his speech and content were appropriate and his cranial nerves were intact. His muscle strength was five out of five and deep tendon reflexes were 2/4. Ankle jerks were nil and Romberg was negative. Dr. Foster diagnosed coronary artery disease currently comfortable and with heart problems that were quiescent; dyspepsia, right eye surgery secondary to trauma, post nasal drip, back pain which was currently quiescent, gout and hyperlipidemia.

On March 2, 1999, Dr. Foster reported that plaintiff had excellent blood pressure, that his lungs were clear and his heart was regular. He diagnosed hypertension, dyspepsia, much improved on Prilosec, gout and hypercholesterolemia.

On March 29, 1999, Dr. Hicks had plaintiff undergo a stress test with thallium. Dr. Hicks concluded that plaintiff had above average exercise tolerance for his age, and a normal heart rate and blood pressure response to exercise. The ST analysis was negative for ischemia and plaintiff denied any chest discomfort. The thallium scan was negative.

On May 6, 1999, plaintiff underwent another exercise test on May 6, 1999. Dr. Michael Goodfriend considered the results to be equivocal. His report noted that plaintiff experienced no exercise-induced chest pain or arrhythmia; that the ST changes at peak exercise were consistent with ischemia, which did not persist post exercise.

Dr. Foster saw plaintiff on May 11, 1999, and noted that: plaintiff's blood pressure was 120/88; he weighed 198 pounds; his pulse was 68 and regular; his respirations were sixteen and comfortable; his lungs were clear to auscultation; his heart sounds were regular; his epigastrum was non-tender; and his extremities showed no edema. Dr. Foster cleared plaintiff to return to full-time work.

On June 17, 1999, Dr. John H. Demenkoff evaluated plaintiff consultatively at the request of the New York State Department of Social Services, Office of Disability Determinations. In his report, Dr. Demenkoff concluded that since January 1999, plaintiff had done relatively well, with no chest pain, no need of nitroglycerin and no shortness of breath with exercise. He noted that plaintiff was able to do "lots of" work around his home, that he was functionally able to do as he wished, but described a pattern of doing fine for a while, and then having increased chest pain requiring further intervention. Dr. Demenkoff noted that plaintiff's current medications were Zocor, Toprol, Colchicine, Allopurinol, aspirin and Zantac. He also noted that plaintiff was active, worked around his home, went grocery shopping and did activities such as mowing the lawn without any shortness of breath. Upon physical examination, Dr. Demenkoff found that: plaintiff was quite alert and oriented; his neck was supple; his lungs were clear; his heart tones were regular, without gallops, rubs, or murmurs; his abdomen was soft, without organomegaly or tenderness; there was no cyanosis, clubbing or edema of the extremities; he

had negative straight leg raising, good hip motion, and was able to walk on his toes and heels; he could bend over and touch his toes; he had excellent motor; his right index finger was absent secondary to traumatic injury; and plaintiff's neurological examination was confocal.

Dr. Demenkoff's impression was that of a forty-six year old male with optimally managed and medically stable coronary artery disease. He reported that plaintiff did not have any symptoms reflective of ischemic heart disease at this point, or congestive heart failure. He further stated that plaintiff had reasonable left ventricular function based on most recent catheterization and it appeared to Dr. Demenkoff that plaintiff was able to work, but that heavy exertional labor was not the best type of occupation for him.

On July 1, 1999, Dr. Reid,[3] a state agency medical consultant, reviewed the medical record and concluded that plaintiff was capable of lifting and/or carrying fifty pounds occasionally and twenty-five pounds frequently, and capable of standing, walking and sitting about six hours in an eight hour work day (medium work). Dr. Reid noted plaintiff's history of medical procedures and also that since January 1999, plaintiff had no shortness of breath or dyspnea on exertion, that his blood pressure was 130/90, and on a stress test, plaintiff had been able to exercise for thirteen minutes at fifteen METS. His maximum heart rate was 167 with no chest pain or ischemic.

On July 29, 1999, plaintiff underwent another exercise test administered by Dr. Abdul Waheed. The test was negative for exercise-induced ischemia by symptoms and EKG. Dr. Waheed noted that hemodynamic response was somewhat blunted,

probably due to Beta blocker use. A thallium scan revealed questionable ischemia.

On August 16, 1999, chest x-rays read by Dr. Jude Leblanc revealed no active chest disease and noted no changes since the last study done in January 1999.

In August 1999, plaintiff experienced a recurrence of symptoms. On August 18, 1999, cardiac catheterization revealed 90% stenosis within the stented segment of the right anterior descending artery. Plaintiff underwent percutaneous revascularization on August 18, 1999, and Dr. Hicks released him following day, telling plaintiff he could engage in activities as tolerated, but with no heavy lifting.

On September 3, 1999, Dr. Cynthia Terry saw plaintiff for back spasms that he complained has been occurring over the last several weeks. She found deep tendon reflexes were symmetrical in both feet and straight leg raising was negative. Dr. Terry diagnosed lumbosacral strain and recommended physical therapy. She prescribed Flexeril and Motrin.

On September 9, 1999, Dr. Hicks, in a "To Whom It May Concern" letter, wrote:

> Mr. Eldred [plaintiff] has had multiple cardiac problems over the past 1–1/2 years. These seem to be recurrent. At this time, I would think it would probably be reasonable for him to be on some type of temporary disability until his cardiac situation has stabilized.

R. at 297.

On November 16, 1999, Dr. Abdul Waheed had plaintiff undergo an exercise stress test, which revealed an abnormal result according to the EKG, although plaintiff experienced no symptoms of angina. Dr. Waheed concluded that plaintiff's exercise capacity was good and hemodynamic response was normal. A contempo-

---

**3.** The doctor's first name is not listed in the report. R. at 265.

raneous thallium scan was questionable for mild ischemic.

Although plaintiff had no symptoms of chest discomfort, on November 23, 1999, he underwent cardiac catheterization because Dr. Hicks was concerned about the abnormal stress test and also wanted to surgically address rectal bleeding and needed the catheterization for preoperative clearance. Results revealed no critical coronary artery disease and essentially normal left ventricular systolic function.

On December 13, 1999, state agency medical consultant Dr. Daly[4] reviewed the medical record which contained evidence through September, 1999, and included Dr. Hicks's statement that plaintiff should have a temporary disability and evidence that plaintiff reported pain with substantial work. He concluded, "we clearly need up to date medical evidence." R. at 308.

On February 5, 2000, Dr. Richard White reviewed chest x-rays taken the previous day and concluded they revealed emphysema.

On February 24, 2000, state agency medical consultant Dr. Randall[5] concluded that plaintiff could perform medium work and that he had limited use of his right hand for fine manipulation.

On March 27, 2000, plaintiff underwent a psychological evaluation by Norm Quirion, Ph.D, Staff Psychologist at the Veterans Administration in Bath, New York. Dr. Quirion diagnosed depressive disorder, not otherwise specified, alcohol abuse in remission, cannabis abuse in remission, mixed personality disorder with avoidant, compulsive and schizoid features.

On March 29, 2000, Dr. Anthony Gerbasis saw plaintiff for complaints of low back pain. Plaintiff walked with a guarded gait

and x-rays revealed spina bifida at L5–S1 and moderate degenerative changes. A CT scan revealed a bulging lumbar disc at L5–S1. Dr. Gerbasis prescribed Tylenol 3 and hot showers.

On April 22, 2000, plaintiff was evaluated for complaints of back pain by Dr. Karen Mead. Her examination showed that: he was able to get out of a chair; his gait was somewhat antalgic; he appeared to have pain with ambulation; and he had diminished reflexes of the left ankle and pain over the sciatic notch. Dr. Mead concluded that plaintiff had lumbar disc disease. She wrote in her report that plaintiff could not lift greater than ten pounds, sit for more than ten minutes, walk great distances, climb, bend, twist, or do any repetitive activities.

Dr. Patrick Schamel evaluated plaintiff on August 18, 2000, for a painful right toe. He prescribed Allopurinol and Indomethacin for gout.

On October 9, 2000, Dr. Hicks reported in a document entitled "Social Security Administration Office of Hearings and Appeals Complete Medical Report (Physical)," that plaintiff had a history of multiple myocardial infarctions and congestive heart failure. Dr. Hicks listed plaintiff's diagnoses as coronary artery disease and angina. Dr. Hicks further wrote that he had treated plaintiff with multiple angioplasties and that plaintiff had an adequate response to treatment. His prognosis was "guarded." R. at 345.

In his October 9, 2000, report, Dr. Hicks opined that plaintiff could lift and carry up to twenty pounds occasionally, sit for eight hours in an eight-hour workday, four hours at a time, stand eight hours in an eight-hour work day, three hours at a time, and walk six hours in an eight-hour workday,

---

**4.** His first name does not appear on the report. R. at 308.

**5.** His first name does not appear on the report. R. at 317.

three hours at a time. He also indicated that plaintiff could occasionally climb, crouch and crawl, and could frequently, stoop and kneel, and continuously balance. Further, he specified plaintiff could frequently reach, handle, feel, hear and speak, and he could occasionally push/pull. He marked the form indicating that plaintiff had no restrictions in working around heights, moving machinery, chemicals, noise or humidity and that he had no restrictions on his ability to work around dust, temperature extremes, fumes or vibrations.

## V. DISCUSSION

### A. THE STANDARD OF REVIEW

The issue to be determined by this Court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir.1998). It is well settled that

> it is not the function of a reviewing court to determine *de novo* whether the claimant is disabled. Assuming the Secretary [Commissioner] has applied proper legal principles, judicial review is limited to an assessment of whether the findings of fact are supported by substantial evidence; if they are supported by such evidence, they are conclusive.

*Parker v. Harris*, 626 F.2d 225, 231 (2d Cir.1980). Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* at 231–32. Where there are gaps in the administrative record or where the Commissioner has applied an incorrect legal standard, remand for further development of the record may be appropriate. *Id.* at 235. However, where the record provides persuasive proof of disability and a remand would serve no useful purpose, the Court may reverse and remand for calculation and payment of benefits. *Id.*

### B. THE STANDARD FOR FINDING A DISABILITY

For purposes of the Social Security Act, disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." Social Security Act § 223(d)(1)(A), 42 U.S.C. § 423(d)(1)(A); *Schaal*, 134 F.3d at 501. The Social Security Administration ("SSA") has promulgated regulations which establish a five-step sequential analysis an ALJ must follow:

> First, the SSA considers whether the claimant is currently engaged in substantial gainful employment. If not, then the SSA considers whether the claimant has a "severe impairment" that significantly limits the "ability to do basic work activities." If the claimant does suffer such an impairment, then the SSA determines whether this impairment is one of those listed in Appendix 1 of the regulations. If the claimant's impairment is one of those listed, the SSA will presume the claimant to be disabled. If the impairment is not so listed, then the SSA must determine whether the claimant possesses the "residual functional capacity" to perform his or his past relevant work. Finally, if the claimant is unable to perform his or his past relevant work, then the burden shifts to the SSA to prove that the claimant is capable of performing "any other work."

*Schaal*, 134 F.3d at 501(citations and internal quotation marks omitted).

## C. THE ALJ'S DECISION

The ALJ found for plaintiff in steps one and two, and determined at step three that although plaintiff's impairment was "severe," he did not suffer from an impairment or impairments that met or exceeded the Listings in Appendix 1, Subpart P, Regulation No. 4. He also found that plaintiff's allegations regarding his limitations were not credible since they were not supported by the medical evidence. R. at 15. Based on plaintiff's medical records, the ALJ concluded that plaintiff retained the residual functional capacity to perform sedentary work, with lifting no more than ten pounds at a time, to sit for no more than six hours, stand no more than two hours, and walk no more than two hours, all in an eight-hour work day. R. at 15. Because plaintiff's past relevant work required lifting 100 pounds, the ALJ found plaintiff could not perform his past relevant work. He consulted the Medical–Vocational Guidelines of Appendix 2 of Subpart P of the Regulations and determined, based on plaintiff's age, residual functional capacity and lack of transferrable skills, that plaintiff was "not disabled" as a result of Medical–Vocational Rule 201.21.

## D. ANALYSIS

■ Plaintiff cannot be paid disability insurance benefits because he did not have a medically determinable impairment that precluded him from engaging in substantial gainful activity for at least twelve consecutive months. 42 U.S.C. § 423(d)(1)(A). Here, the record shows that plaintiff had a heart attack on November 21, 1997. However, by May 1998, his cardiologist, Dr. Hicks, cleared him to return to work without restriction. Further, on October 23, 2000, Dr. Hicks opined that plaintiff could lift and carry up to twenty pounds frequently, sit eight hours, stand eight hours

and walk six hours in an eight hour work day. Moreover, every other physician who evaluated plaintiff's functional abilities from a cardiac standpoint concluded that there was some kind of work that he could perform, ranging from sedentary to medium work. Therefore, the ALJ reasonably concluded that plaintiff was able to perform sedentary work.

■ Despite his own doctor's opinion, plaintiff alleged that he could not work due to chest pain. However, plaintiff's statements as to pain are not alone conclusive evidence of disability. 42 U.S.C. § 423(d)(5)(A). Rather, there must be medical signs and findings, which show the existence of a medical impairment which could reasonably be expected to produce the pain alleged and, which when considered with all evidence required to be furnished, would lead to a conclusion that the individual is under a disability. *Id.* Here, plaintiff's symptoms must be considered in light of the objective findings reported, and in light of other factors, such as statements by physicians about the intensity and persistence of symptoms which may reasonably be accepted as consistent with the medical signs and findings. *Id.* The ALJ was entitled to consider plaintiff's statements about his symptoms in relation to statements by his treating and examining sources. 20 C.F.R. §§ 404.1529(c)(3), (4), 416.929(c)(4).

■ In evaluating subjective symptomatology, the ALJ was entitled to evaluate plaintiff's credibility, and arrive at an independent judgment regarding subjective symptoms in light of the medical findings and other evidence regarding the true extent of alleged symptoms. *Mimms v. Heckler*, 750 F.2d 180, 185–86 (2d Cir. 1984). The Court will defer to the credibility findings of the ALJ, who observed plaintiffs' demeanor. *See Serra v. Sulli-*

van, 762 F.Supp. 1030, 1034 (W.D.N.Y. 1991)

■ Here, plaintiff's testimony about disabling chest pain is inconsistent with the medical expert opinion of his own doctor and other medical expert opinions in the record. Further, while plaintiff also alleged back pain, the record shows that he did not seek treatment for back discomfort until September 3, 1999, well after he applied for Social Security disability payments in October 1998. Moreover, his discomfort started only several weeks prior to September 3, 1999. R. at 340. Objective examination findings by Dr. Cynthia Terry, such as deep tendon reflexes and straight leg raising, were normal. Although plaintiff was seen for back pain on March 29 and April 22, 2000, when examined several months later on August 18, 2000, plaintiff complained only of a painful right toe. Therefore, there is no evidence in the medical record that plaintiff continued to have any significant difficulty with his back after April 2000.

Finally, plaintiff also alleged he suffered from depression. He was first evaluated for complaints of depression in March 2000, well after he applied for disability payments. Further, he presented no evidence of limitations related to depression. The medical record shows only that he was evaluated for complaints of depression, with no evidence of any functional limitations or follow-up treatment. In addition, plaintiff engaged in full activities of daily living. Plaintiff told Dr. John Demenkoff that he was able to do "lots of" work around his home. R. at 264. He stated that he was active, worked around his home, did grocery shopping and such activities as mowing the lawn without any

shortness of breath. The Court finds that substantial evidence supports the ALJ's finding that plaintiff's testimony about disabling symptoms was not credible.

Plaintiff refers to a diagnosis by Dr. Quirion of depressive disorder and mixed personality disorder with avoidant, compulsive and schinoid features. R. at 320–21. The record does not indicate that plaintiff followed-up this diagnosis with treatment.[6] Further, he attached to his responding papers a March 6, 2002, letter from the Department of Veterans Affairs which he states is proof that he has been granted disability benefits by the Department on the basis of their determination that he is 60% disabled as a result of a cardiac condition related to his military service. Further, plaintiff points out the diagnosis of Dr. Anthony Gerbasi that he suffers from spina biffida at L5 and S1, with moderate degenerative changes, and bulging discs at L5 and S1. R. at 342. Plaintiff argues that this is substantive evidence of a disability and was not adequately considered by the ALJ.

The ALJ, in his decision, found that plaintiff's complaints of depression and spinal radiculopathy were not supported by the medical evidence as being impairments that more than minimally limited his functioning and, thus, were not severe. R. at 14. During an examination by Dr. Edward Foster on February 10, 1999, plaintiff's back pain was listed as "currently quiescent" and no mention was made of psychological problems. R. at 336. Dr. Foster's follow-up examination report of March 2, 1999, made no mention of back pain, or depression. On May 11, 1999, Dr. Foster again examined plaintiff and found that he had been "fully active" with "no

---

**6.** Plaintiff did testify before the ALJ that doctors at the Veterans Administration hospital treated him for "psychological" because he was having problems with depression, but neither side points out any record of treatment for depression or any other psychological disorder. R. at 35.

chest pain of any kind." R. at 338. Dr. Foster cleared him to return to full-time work. No mention was made of depression or back pain.

■ Plaintiff's past work was rated as "heavy." Since he is now able to perform only sedentary work, the ALJ considered whether plaintiff could engage in other substantial gainful activity. Here, the ALJ found that given plaintiff's age, education, work experience, and his residual functional capacity for sedentary work, he was able to perform other work in the national economy. Consequently he was not under a disability. 42 U.S.C. § 423(d)(2)(A) (an individual shall be determined to be under a disability only if his impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work); 20 C.F.R. §§ 404.1520(f), 404.1560, 404.1563 and 404.1565. Specifically, the ALJ found that plaintiff was a younger individual (forty-seven years of age as of the date of the decision), and had more than a high school education, but was without transferable work skills. The factual findings of plaintiff's age, education and residual functional capacity correspond to Rule 201.21 of Table 1, 20 C.F.R. Part 404, Subpart P, Appendix 2 (The Medical–Vocational Guidelines). Under Rule 201.27, plaintiff is not considered disabled. 20 C.F.R. § 404.1529; *Heckler v. Campbell*, 461 U.S. 458, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983) (upholding Commissioner's use of the Medical–Vocational Guidelines in making disability determinations). Since plaintiff did not have any nonexertional impairments which significantly affected the range of sedentary work that he could perform, vocational expert testimony was not required to determine the outcome at step five of the

sequential evaluation process. *Bapp v. Bowen*, 802 F.2d 601 (2d Cir.1986).

After thoroughly evaluating the evidence of record, the Commissioner decided that plaintiff was not under a disability within the meaning of the Act. The Commissioner carried her burden of proof of establishing that there were a significant number of jobs that plaintiff could perform in the national economy despite the credible limitations imposed by plaintiff's impairments. The Commissioner's decision is supported by substantial evidence in the record and is, therefore, affirmed. 42 U.S.C. § 405(g).

## VI. CONCLUSION

Accordingly, the Commissioner's motion for judgment on the pleadings (document # 12) is granted. The Commissioner's decision is affirmed.

IT IS SO ORDERED.