**Nicole ARCHER f/b/o J.J.P., Plaintiff,**

**v.**

**Michael J. ASTRUE, Commissioner, Social Security Administration, Defendant.**

**No. 10–CV–01396 WGY.**

United States District Court, N.D. New York.

Dec. 19, 2012.

Louise Marie Tarantino, Albany, NY, for Plaintiff.

Michelle L. Christ, Social Security Administration, New York, NY, Defendant.

### *DECISION and ORDER*

WILLIAM G. YOUNG, District Judge [1].

## I. INTRODUCTION

Nicole Archer ("Archer") brings this action on behalf of her daughter, J.J.P.,[2] pursuant to section 205(g) of the Social Security Act, 42 U.S.C. § 405(g). Archer seeks judicial review of the final decision of the Commissioner of Social Security (the "Commissioner") denying her claims for Supplemental Security Income ("SSI") benefits.

---

**1.** Of the District of Massachusetts, sitting by designation. Reassignment Order, ECF No. 17.

**2.** J.J.P. is a minor. Compl. 2, ECF No. 1. In accordance with Federal Rule of Civil Procedure 5.2(a), the parties referred to J.J.P. by her initials in filings made with the Court. The Court, in this decision and order, will do the same.

### A. Procedural Posture

Archer applied for SSI benefits on behalf of J.J.P. on January 7, 2008, Admin. R. at 82, ECF No. 8, with a protective filing date of December 19, 2007, *id.* at 12. On April 17, 2008, the Regional Commissioner denied the application. *Id.* at 59–62. Archer timely filed a request for a hearing before an Administrative Law Judge (the "hearing officer") on May 5, 2008. *Id.* at 63. On October 6, 2009, a hearing was held.[3] *Id.* at 26–51. Nine days later, the hearing officer issued a decision finding that J.J.P. was not disabled and therefore ineligible to receive SSI benefits. *Id.* at 6–21. On December 9, 2009, Archer, by and through legal aid counsel, timely filed a request for review of the hearing officer's decision by the Appeals Council. *Id.* at 78–81. The Appeals Council denied Archer's request for review on September 27, 2010, transforming the hearing officer's decision into the final decision of the Commissioner. *Id.* at 1–4.

On November 17, 2010, Archer, by and through legal aid counsel, filed the present action with this Court pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). Compl. 1–2, ECF No. 1. The Commissioner filed an answer on March 9, 2011. Def.'s Answer, ECF No. 7. On April 25, 2011, Archer filed a brief in support of reversal of the Commissioner's decision. Pl.'s Br., ECF No. 11. On August 8, 2011, the Commissioner filed a brief in opposition to Archer's brief and in support of his cross-motion for judgment on the pleadings.[4]

---

**3.** A separate hearing involving J.J.P.'s father took place on July 29, 2009. *Id.* at 52–57. No testimony pertaining to the matter at hand was taken at this hearing, however. *Id.* at 53.

**4.** The Commissioner did not file with the Court a separate motion for judgment on the pleadings. For the purposes of this decision and order, however, the Court will regard the

Def.'s Br. Opp'n Pl.'s Mot. Supp. Comm'r's Cross–Mot. J. Pleadings ("Def.'s Br."), ECF No. 15.

## B. Facts of Record

### 1. Initial Preschool Evaluations

J.J.P. was born on August 11, 2004. Admin. R. at 82. In November 2007, prompted by J.J.P.'s parents' concerns regarding delays in J.J.P.'s physical, linguistic, and behavioral development, the Schenectady City School District referred J.J.P. to CloverPatch Early Childhood Services for extensive testing and observation to determine whether she would be eligible for special education services. *See id.* at 248–71.

### a. Occupational Therapy Evaluation

Occupational therapist Marcia Kaufman ("Kaufman") conducted an occupational therapy ("OT") evaluation of J.J.P. on November 15, 2007. *Id.* at 266. J.J.P. exhibited "low muscle tone . . . [and] slight tremors in her right hand." *Id.* Testing revealed that J.J.P.'s total fine motor quotient resided at the 7th percentile, and Kaufman observed that J.J.P. suffered delays in fine motor development. *Id.* at 266–68. A short sensory profile confirmed that J.J.P.'s tactile sensitivity, unresponsiveness to activities, and likelihood of distraction in the presence of environmental stimuli were atypical for a child of her age. *Id.* Although J.J.P. could use the restroom without the assistance of an adult, she experienced challenges using utensils, pouring liquids, and fastening buttons and zippers. *Id.* at 268. Kaufman concluded that J.J.P. suffered from "significant delays in the development of fine motor and sensorimotor skills" and recommended that J.J.P. receive OT services. *Id.*

### b. Physical Therapy Evaluation

Physical therapist Debbie Beach ("Beach") performed a physical therapy ("PT") evaluation of J.J.P. on November 15, 2007. *Id.* at 269. Testing showed that J.J.P. had "diminished strength in her lower extremities," which caused her to collapse after jumping from an elevated surface and to use her hands to push herself up from the floor in order to stand upright. *Id.* at 270. J.J.P. found difficulty maintaining postural stability, and the quickness of her movements often made her unbalanced and led to frequent falls. *Id.* J.J.P. also tended to turn her legs inward and walk on her toes, creating an unnatural gait. *Id.* at 270, 271. On the basis of these observations, Beach ultimately recommended that J.J.P. receive PT services. *Id.* at 271.

### c. Speech and Language Evaluation

Speech and language pathologist Steve Marchant ("Marchant") and speech and language disability teacher Judith Desrosiers ("Desrosiers") conducted an evaluation of J.J.P.'s speech and language capabilities on November 16, 2007. *Id.* at 259. J.J.P.'s oral-motor skills, intelligibility, and use of voice were all acceptable for a child of her age, and her verbal articulation was hampered only by a slight frontal lisp. *See id.* at 260–61. J.J.P. did, however, exhibit significant delays in her receptive and total language abilities and mild delay in her expressive language ability. *Id.* at 261. Nevertheless, Marchant and Desrosiers counseled that these results be "interpreted with caution" because testing had been discontinued due to J.J.P.'s persistent behavioral issues. *Id.* Ultimately, they did not recommend speech therapy. *Id.* at 262.

### d. Psychoeducational Evaluation

Results from a psychoeducational evaluation performed by certified school psychologist Morgan Anne Myatt ("Myatt") on November 19, 2007, revealed significant

---

Commissioner's brief as having incorporated the referenced motion.

deficiencies in J.J.P.'s cognitive, adaptive behavioral, and socio-emotional functioning. *See id.* at 251–56. J.J.P. performed poorly on the Differential Ability Scales—Second Edition ("DAS–II") test[5] administered by Myatt: J.J.P.'s scores pertaining to overall cognitive ability, verbal reasoning ability, and nonverbal reasoning ability fell within the 4th, 6th, and 6th percentiles for her age group, respectively. *Id.* at 251–52. In addition, J.J.P. scored in the low and below-average ranges on a number of DAS–II diagnostic subtests.[6] *Id.*

J.J.P. performed reasonably well on the Vineland Adaptive Behavior Scales, Second Edition ("Vineland–II") test,[7] with scores in written communication, daily living, and socialization skills falling comfortably within the average or above-average ranges. *Id.* at 252–53. J.J.P. exhibited a clinically significant level of maladaptive behavior, however, which was marked by an inability to pay attention, restlessness, impulsiveness, disobedience, an inclination to tease and bully, and physical aggression. *Id.* at 253–54. In sum, Myatt concluded that J.J.P. demonstrated "more maladaptive behaviors than 98% of other children her age." *Id.* at 253.

Results from a Behavior Assessment System for Children, Second Edition ("BASC–2") test[8] revealed that J.J.P. exhibited clinically significant levels of hyperactivity, aggression, and attention problems. *Id.* at 254. She was categorized as "at risk" with respect to her propensity to engage in atypical behavior, *withdraw* from her surroundings, and encounter difficulty in social situations. *Id.*

Information gleaned from classroom and behavioral observation sessions corroborated the results from the DAS–II, Vineland–II, and BASC–2. Myatt acknowledged that J.J.P. spoke in complete sentences and could make verbal requests for items of interest (such as food). *Id.* at 249–50. She noted, however, that during class, J.J.P. provoked and bullied her peers, ran around the classroom, failed to follow teacher instructions, and often needed redirection, prompting, and adult supervision to stay on task. *See id.* At an off-site treatment location, Myatt noted further that J.J.P., in addition to exhibiting a short attention span and unusually high levels of activity, "thr[ew] blocks at the examiner, push[ed] testing materials off the table, ripp[ed] the stimulus book, and hit[ ] the examiner." *Id.* at 250. Based on the test results and on her own observations, Myatt recommended to the Committee on Preschool Special Education ("CPSE") that J.J.P. be classified as a student with a disability, that she be placed in a small classroom setting with a low student-teacher ratio, and that she be reevaluated at a later time. *Id.* at 255–56.

## 2. Individualized Education Programs

On December 6, 2007, CPSE representatives gathered to design an individual-

---

**5.** The DAS–II is used by psychologists to assess cognitive functioning in preschool-aged children. *Id.* at 251.

**6.** Due to the examiner's frequent deviations from the standardized testing format because of J.J.P.'s inability to respond appropriately to the testing situation, however, Myatt expressed doubt as to the accuracy of the DAS–II results, stating that "the scores ... represent a low estimation of cognitive potential" and recommending that J.J.P. "be reassessed at a time when she is better able to demonstrate her skills." *Id.* at 251.

**7.** The Vineland–II assesses adaptive behavior by examining a tester's communication, daily living, and socialization skills, as well as their maladaptive behavior index. *See id.* at 252–54.

**8.** The BASC–2 is described as "an integrated system designed to facilitate the differential diagnosis and classification of a variety of emotional and behavioral disorders of children and to aid in the design of treatment plans." *Id.* at 254.

ized education program ("IEP") for J.J.P. for the remainder of the 2007–2008 academic year. *Id.* at 294, 317. Drawing upon the test results from J.J.P.'s preschool evaluations, *see id.* at 295–301, CPSE formally classified J.J.P. as a "[p]reschool [c]hild with a disability," *id.* at 294, and found that she qualified for special education services (which included special transportation, PT and OT two times per week, social work counseling once per month, speech therapy twice per week, and placement in a class that featured a student-teacher-aide ratio of 8:1:1 [9]), *id.* at 294–95, 304.

CPSE met again on August 7, 2008, to determine J.J.P.'s IEP for the 2008–2009 academic year. *Id.* at 417. J.J.P. was once again deemed eligible for special education services, and although social work counseling was reduced to four times per year, the other accommodations generally remained consistent. *Id.* at 417–18.

On April 2, 2009, CPSE drew up a new IEP for the 2009–2010 academic year. *Id.* at 130. Comments from the IEP indicated that J.J.P. continued to experience difficulty interacting with teachers and peers, exhibit aggressive behavior, and require prompting and redirection. *See id.* at 131–32, 134. She also needed reminders to clean up after herself, and toilet training proved largely unsuccessful. *Id.* at 132. OT was decreased in frequency to once per week, but CPSE recommended that J.J.P. attend social work counseling sessions once per week. *Id.* at 134. Later in the year, the 2009–2010 IEP was amended to decrease the student-teacher-aide ratio in

J.J.P.'s special education class from what was then 12:1:4 to 9:1:3. *Id.* at 240.

### 3. Teacher Questionnaire

J.J.P.'s preschool special education teacher, Rachna Shankar ("Shankar"), completed a teacher questionnaire for J.J.P. on January 24, 2008, after having known J.J.P. for one month's time. *Id.* at 286, 293. The questionnaire asked Shankar to comment on J.J.P.'s ability to (1) acquire and use information, (2) attend and complete tasks, (3) interact with and relate to peers, (4) move about and manipulate objects, and (5) care for herself.[10] *Id.* at 287–91.

With regard to J.J.P.'s capacity to acquire and use information, Shankar reported that J.J.P. had a very serious problem "[e]xpressing ideas in written form" and serious problems "[c]omprehending oral instructions," "[u]nderstanding school and content vocabulary," "[r]eading and comprehending written material," "[r]ecalling and applying previously learned material," and "[a]pplying problem-solving skills in class discussions."[11] *Id.* at 287. Shankar further noted that J.J.P. struggled to follow basic instructions, often required one-on-one assistance with classwork and in the maintenance of her hygiene, and lacked spatial recognition, sorting, sequencing, and motor skills. *Id.*

With regard to J.J.P.'s capacity to attend and complete tasks, Shankar reported that J.J.P. had very serious problems "[f]ocusing long enough to finish assigned activit[ies] or task[s]" and "[c]arrying out multi-step instructions," and had serious

---

**9.** Although the student-teacher-aide ratio was recorded as 8:1:1 in the 2007–2008 IEP, in actuality, J.J.P. was placed in a classroom with a 15:1:2 ratio. *See id.* at 286.

**10.** These categories—called "domains" of functioning—substantially mirror those used by the Social Security Administration to de-

termine a child's disability and are explained at length below.

**11.** J.J.P. demonstrated obvious problems in three out of the ten listed activities pertaining to acquiring and using information. *Id.* at 287.

problems "[s]ustaining attention during play/sports activities," "[c]arrying out multi-step instructions," "[o]rganizing [her] own things or school materials," "[c]ompleting class/homework assignments," and "[c]ompleting work accurately without careless mistakes."[12] *Id.* at 288. Shankar further noted that J.J.P. experienced difficulty sustaining attention and, in terms of development, lagged behind her peers. *Id.*

With regard to J.J.P.'s capacity to interact with and relate to others, Shankar reported that J.J.P.'s only serious problem involved "[i]ntroducing and maintaining relevant and appropriate topics of conversation"; J.J.P.'s capabilities regarding the remaining twelve activities listed in this section of the questionnaire were markedly less problematic. *Id.* at 289. In addition, Shankar commented that J.J.P. "[was] not a behavior problem" and reported little difficulty in her ability to understand J.J.P.'s speech. *Id.* at 289–90. Shankar noted, however, that J.J.P. "ha[d] a hard time following classroom routine" and that "[s]he [did not] have much interaction and conversations with other children in the classroom." *Id.* at 289.

With regard to J.J.P.'s capacity to move and manipulate objects, Shankar reported that J.J.P. had serious problems in six out of seven activities listed in this section of the questionnaire (which included standing, balancing, hand-eye coordination, dexterity, spatial awareness, and controlling motor movements). *Id.* at 290. Shankar further noted that J.J.P. had a tendency to trip and fall and "ha[d] difficulty using scissors." *Id.*

With regard to J.J.P.'s capacity to care for herself, Shankar reported that J.J.P.'s only serious problems involved "[t]aking care of personal hygiene" and "[k]nowing when to ask for help"; J.J.P.'s capabilities regarding the remaining eight activities listed in this section of the questionnaire were either nonexistent or ranged from slight to obvious. *Id.* at 291. Shankar noted, however, that although J.J.P. was generally well-behaved in class, "when she ha[d] to share toys and other classroom supplies, she snatche[d] them, [and] pushe[d] other kids to get what she want[ed]." *Id.*

In a section designated for additional comments, Shankar remarked that J.J.P. was "younger than most children in the classroom" and that "[o]ne of the reasons for her immaturity is her age." *Id.* at 293. Thus, Shankar recommended that J.J.P. be placed in a class with like-aged students. *Id.*

### 4. Special Education Annual Reviews

J.J.P. underwent additional tests in the summer of 2008 to identify possible changes in her developmental status (which had not been formally evaluated since J.J.P.'s initial preschool evaluations). *See id.* at 380–93. On the Developmental Assessment of Young Children ("DAYC") test,[13] J.J.P. placed in the 4th, 25th, and 14th percentiles for cognitive development, adaptive skill development, and social and emotional development, respectively. *Id.*

---

12. J.J.P. exhibited slight problems, obvious problems, or no problems at all in six out of the thirteen listed activities pertaining to attending and completing tasks. *Id.* at 288. Regardless of their level of severity, however, all of J.J.P.'s problems manifested themselves on a daily basis. *Id.*

13. The DAYC is used to "[i]dentify children from birth through 5 years who may have possible delays in cognition, communication, social-emotional development, physical development, and adaptive behavior." *Developmental Assessment of Young Children*, Pearson, http://www.pearsonassessments.com/HAIWEB/Cultures/en-us/Productdetail.htm?Pid=076–1618–244&Mode=summary (last visited Dec. 4, 2012) (emphasis omitted).

at 382. J.J.P.'s OT and PT reviews revealed that J.J.P. had made few gains in motor skill development. *See id.* at 384–86, 387–89. J.J.P.'s improvements with respect to language development, however, were more notable: her receptive language moved from the below-average range to low average, *id.* at 391, her articulation skills remained age-appropriate, *id.* at 392, her social communication skills had improved, *id.*, and her vocal quality, fluency, and rate of speech ·matched that of children her age, *id.* Nevertheless, J.J.P. "demonstrate[d] difficulty identifying quantitative concepts," *id.* at 391, "continue[d] to exhibit difficulty following two-step related commands without gestural cues," *id.*, and saw little improvement in expressive language capability, *id.* at. 392. Ultimately, sustained OT and PT services were recommended, *id.* at 385, 389, and speech therapy was discontinued, *id.* at 393.

A second special education annual review took place in the spring of 2009. *See id.* at 398–415. J.J.P. once again took the DAYC, this time scoring in the 8th, 10th, 9th, and 27th percentiles for cognitive development, social and emotional development, adaptive skill development, and communication skill development, respectively. *Id.* at 404. Shankar, having been asked again to evaluate J.J.P. as part of the annual review, remarked that J.J.P. continued to have difficulty concentrating, required adult supervision and attention, exhibited poor self-control in her interactions with peers, needed direction with regard to hygiene and eating, and acted impulsively. *Id.* at 404–06. In addition, although Shankar did acknowledge that· J.J.P. had the capacity to "consistently identify basic colors," "match items that are the same as well as sort them by color," and "understand some early concepts such as big/little and heavy/light", she admitted that J.J.P. "require[d] frequent redirections and support to follow the classroom routine," "need[ed] help with problem solving as well as negotiating skills," could "only recognize the letter J," had difficulty tracing letters and images, experienced challenges in cutting with scissors, and found it hard to answer "simple wh-questions." *Id.* at 404. According to an OT review, J.J.P. fell within the 12th percentile in fine motor development (which was in the below average range), and she had persistent issues with hygiene, cutting, and self-control. *See id.* at 410–12. J.J.P.'s PT review showed that J.J.P. had made some progress· in physical status and functional skills, but her gross motor quotient score ·of 68 ·fell within the 1st percentile (which was described as very poor) and she· still had trouble walking, running, ·and· achieving· balance. *See id.* ·at 413–14. ·As a result, both continued OT· and PT were recommended. *Id.* at 412, 415.

### ·5. **Medical Examinations**

J.J.P. underwent a child psychiatric evaluation on April 7, 2008, which was conducted by consultative examiner Dr. Annette Payne ("Dr. Payne"). *Id.* at 324–28. J.J.P. was reportedly hyperactive during the course of the mental status portion of the evaluation, requiring "frequent behavioral limit setting by the examiner." *Id.* at 325. Although J.J.P.· exhibited few to no deficiencies in appearance, speech, thought-processing, sensory skills, orientation, insight, and judgment, Dr. Payne described her mood to be "agitated" and her attention and· concentration skills to be "[i]mpaired." *Id.* at 325–26. In addition, Dr. Payne observed that J.J.P. had difficulty caring for herself, comprehending and complying with directions, and engaging appropriately in social settings. *Id.* at 326–27. Ultimately, Dr. Payne diagnosed J.J.P. with the disruptive behavior disorder of attention deficit hyperactivity disorder ("ADHD") and recommended that she

receive psychotropic medication evaluation, counseling, and placement in a special education class with a high degree of structure and adult supervision. *Id.* at 327.

In August of the same year, J.J.P. was examined by pediatric neurologist Dr. Timothy Foster ("Dr. Foster"). *Id.* at 373–74. Although he observed that J.J.P. exhibited "very poor motor planning" during the physical portion of the examination and was "very self-directed and difficult to formally assess," Dr. Foster ultimately concluded, on the basis of her performance in other areas, that she had no material issues regarding her physical health. *Id.* at 374. During the neurological portion of the examination, Dr. Foster found that J.J.P. had "grossly intact" vision, "generalized decreased [muscle] tone," and had trouble alternating movements rapidly, but the remainder of the criteria considered presented few to no issues. *Id.* Dr. Foster stated that J.J.P.'s neurological examination results, as well her clinical history, was "consistent with static encephalopathy that is presenting as generalized hypotonia, developmental delay, and Attention Deficit Hyperactivity Disorder (ADHD)." *Id.* Nevertheless, he desired to reevaluate J.J.P. at a later date.[14] *Id.*

On March 16, 2009, J.J.P. visited Dr. Foster again for a follow-up evaluation. *Id.* at 432. He reported that J.J.P. was "compulsive" and had "difficulty processing multi step command[s]," leading him to reaffirm his belief that she likely suffered from ADHD. *Id.* In a second follow-up evaluation held on June 17, 2009, Dr. Foster described J.J.P. as "panicky" and mentioned that she did not experience any difficulty sleeping. *Id.* at 435. He ulti-

mately prescribed a treatment plan that included 10 mg of Focalin XR.[15] *Id.; id.* at 30.

## II. ANALYSIS

### A. Standard of Review

■■■ A hearing officer's decision denying SSI benefits may be overturned "only where it is based upon legal error or is not supported by substantial evidence." *Rosa v. Callahan,* 168 F.3d 72, 77 (2d Cir.1999). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cage v. Comm'r of Soc. Sec.,* 692 F.3d 118, 122 (2d Cir.2012) (quoting *Halloran v. Barnhart,* 362 F.3d 28, 31 (2d Cir.2004)) (internal quotation marks omitted). A reviewing court is instructed to "afford the Commissioner's determination considerable deference, and may not substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review." *Romasz ex rel. A.H.N. v. Astrue,* No. 1:11–CV–1467 (GTS), 2012 WL 5334752, at *3 (N.D.N.Y. Oct. 26, 2012) (Suddaby, J.) (alteration in original) (quoting *Valente v. Sec'y of Health & Human Servs.,* 733 F.2d 1037, 1041 (2d Cir.1984)) (internal quotation marks omitted). That said, a reviewing court, in determining whether the hearing officer's decision is indeed supportable by substantial evidence, is under an obligation to "consider[ ] the whole record ... [and] examin[e] evidence from both sides." *Id.* at *2 (quoting *Williams ex rel. Williams v. Bowen,* 859 F.2d 255, 258 (2d Cir.1988)).

---

**14.** Although J.J.P. was diagnosed with ADHD in August 2008, she was not prescribed medication to treat her condition until June 2009, given the concerns expressed by Dr. Foster about starting her on a treatment plan at such a young age. *Id.* at 48.

**15.** Focalin XR is a prescription medication designed to moderate ADHD symptoms in both children and adults. *Fast Facts About Focalin XR,* Focalin XR, http://www.focalinxr.com/info/about-focalinxr.jsp (last visited Dec. 4, 2012).

A child under the age of eighteen will be considered disabled if it can be shown that she has "a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i). The Social Security Administration ("SSA") has devised a three-step process for hearing officers to utilize in determining whether a child is disabled under the Code of Federal Regulations (the "Regulations"). 20 C.F.R. § 416.924(a). At step one, the hearing officer is charged with determining whether the claimant is engaged in "substantial gainful activity," *id.,* which is defined as "work activity that involves doing significant physical or mental activities" typically in exchange for "pay or profit," *id.* § 416.972(a)-(b). If the claimant is not engaging in substantial gainful activity, then the hearing officer may proceed to step two, at which the hearing officer must determine whether the claimant has "an impairment or combination of impairments that is severe." *Id.* § 416.924(a). If the claimant is found to have a severe impairment or a combination of severe impairments, the analysis proceeds to the third step, at which point the hearing officer must determine whether the claimant has an impairment or combination of impairments that "meets, medically equals, or functionally equals" a presumptively disabling condition found within the Regulations' listings of impairments (the "Listings"). *Id.; see also* 20 C.F.R. pt. 404, subpt. P, app. 1.

A child's functional limitations are evaluated pursuant to criteria set forth in the following six domains of functioning: (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) caring

for yourself, and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1)(i)-(vi); *see also Keene ex rel. J.T. v. Astrue,* No. 10-cv-00360 (WGY), 2012 WL 5269624, at *7 (N.D.N.Y. Oct. 24, 2012). A medically determinable impairment or combination of impairments is considered to functionally equal a condition in the Listings if it "result[s] in 'marked' limitations in two domains of functioning or an 'extreme' limitation in one domain." 20 C.F.R. § 416.926a(a). A marked limitation is characterized in the Regulations as any limitation that is "more than moderate but less than extreme." *Id.* § 416.926a(e)(2)(i) (internal quotation marks omitted). "A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with [the claimant's] ability to function independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(C).

**B. Hearing Officer's Decision**

On October 15, 2009, the hearing officer rendered an unfavorable decision with regard to J.J.P.'s eligibility for SSI benefits. Admin. R. at 6. In his findings of fact and conclusions of law, the hearing officer found that J.J.P. had not engaged in substantial gainful activity since filing for SSI benefits. *Id.* at 12. The hearing officer acknowledged that J.J.P. was severely impaired by ADHD and speech defects. *Id.* The hearing officer further noted that records failed to show that J.J.P. suffered from "an impairment or combination of impairments that meets or medically equals one of the [Listings]." *Id.* In addition, the hearing officer stated that J.J.P. "did not have an impairment or combination of impairments that functionally equals the listings." *Id.*

With regard to the domain of acquiring and using information, the hearing officer found that J.J.P. exhibited less than marked limitation. *Id.* at 14. He discredited the January 2008 evaluation of J.J.P. by Shankar, highlighting the fact that the preschool special education teacher had known J.J.P. for only a month at the time she completed the teacher questionnaire. *Id.* In addition, the hearing officer attributed J.J.P.'s misbehavior to her particularly young age (in relation to her peers) and cited Shankar's recommendation that J.J.P. be placed in a class with like-aged children as evidence in support of his conclusion. *Id.* at 14–15. The hearing officer also made reference to J.J.P.'s most recent evaluations to show that she had indeed made progress in her development, *Id.* at 15 (noting, *inter alia,* that J.J.P.'s "behavior and skills as compared to her peers were rated above emerging, and just below somewhat"). The hearing officer closed this section of his decision by observing that "[w]hile [J.J.P.] experiences some distractability, she only recently began taking medication in June 2009." *Id.*

With regard to the domain of attending and completing tasks, the hearing officer found that J.J.P. exhibited less than marked limitation. *Id.* The hearing officer stated that Shankar's assessment of J.J.P.'s "serious limitations" were undercut by the brief amount of time that she had spent with J.J.P. and by J.J.P.'s age. *Id.* at 15–16. He then proceeded to comment on J.J.P.'s deficiencies in development, drawing upon earlier medical and observational evaluations indicating her inclination toward hyperactivity and her continued need for speech therapy, OT, PT, and social work counseling. *Id.* at 16 (recounting, *inter alia,* that J.J.P. "was noted to get distracted by objects and sounds in the classroom," "had a hard time attending to tasks that were asked of her," "required a physical prompt to get her back on task,"

"needed frequent behavioral limits," and displayed an "agitated" mood).

With regard to the domain of interacting and relating with others, the hearing officer found that J.J.P. exhibited less than marked limitation. *Id.* at 17. Again, the hearing officer mentioned Shankar's one-month relationship with J.J.P. and J.J.P.'s young age as principal reasons militating against the awarding of SSI benefits. *Id.* Further, the hearing officer cited details from evaluations conducted from 2007 to 2009 as ample evidence of J.J.P.'s gains in receptive learning, basic language concept identification, receptive vocabulary, articulation, and general social skills development. *Id.* at 17–18.

With regard to the domain of moving about and manipulating objects, the hearing officer found that J.J.P. exhibited a marked limitation. *Id.* at 18. According to the hearing officer, Shankar's observation of J.J.P.'s poor motor skills, the results of the 2009 OT review, and Dr. Foster's diagnoses of static encephalopathy, developmental delay, and ADHD, provided more than sufficient evidence of marked limitation. *Id.* at 19.

With regard to the domain of caring for yourself, the hearing officer found that J.J.P. exhibited less than marked limitation. *Id.* at 20. He relied heavily upon Shankar's conclusions that J.J.P. had only slight to obvious problems in completing most of the activities listed in the section of the questionnaire that pertained to this domain. *Id.* In addition, the hearing officer once again referenced J.J.P.'s age as the source of her immaturity. *Id.* He made a point, however, to highlight several ways in which J.J.P. continued to experience difficulty in undressing, managing personal items, using the restroom, and eating. *Id.*

With regard to the domain of health and physical well-being, the hearing officer

found that J.J.P. exhibited no limitation. *Id.* at 21.

As a result of these findings, the hearing officer deemed J.J.P. ineligible to receive SSI benefits. *Id.*

### C. Matters Remaining in Dispute

Archer appeals two issues. Pl.'s Br. 1. First, Archer challenges the hearing officer's conclusion that J.J.P.'s impairments were not functionally equivalent to a listed impairment, specifically arguing that J.J.P. demonstrated marked limitations in the domains of acquiring and using information, attending and completing tasks, and interacting and relating with others. *Id.* at 1–2. Second, Archer argues that the hearing officer failed to take into proper account "the extent to which J.J.P. is unable to function without the significant educational support and structure currently in place as part of her special education services." *Id.* at 2.

### 1. Acquiring and Using Information

The domain of acquiring and using information is focused principally on assessing the degree to which a child is able to acquire and learn information and to use the information that she has learned. 20 C.F.R. § 416.926a(g). According to the Regulations, a normally functioning preschool-age child (that is, one who is between the ages of three and six) should be able to, among other things, match letters, count, sort shapes, paint, color, use scissors, ask and answer questions, and follow directions. *Id.* § 416.926a(g)(2)(iii). Evidence of limited functioning in the domain of acquiring and using information includes an inability to recall information learned in class and difficulty in speaking in complex sentences and explaining one's opinions. *Id.* § 416.926a(g)(3)(iii), (v).

■■ The lion's share of the evidence confirms that J.J.P. suffers from a marked limitation in her ability to acquire and use information. The hearing officer cast doubt on the usefulness of Shankar's January 2008 teacher questionnaire—which reported serious or very serious problems in six out of the ten evaluative criteria for the domain of acquiring and using information, Admin. R. at 287—because Shankar had known J.J.P. for only a month's time when she completed the questionnaire. *Id.* at 14. This stated rationale, however, flies directly in the face of SSA policy, which expressly treats teachers as "valuable sources of evidence for assessing impairment severity and functioning" based on their close interaction with students on a regular basis. SSR 06–03P, 2006 WL 2329939, at *3 (Aug. 9, 2006). Moreover, the duration of a teacher's relationship with a claimant, while important, is not dispositive. The SSA, in a policy interpretation ruling published in 2006, identified a number of factors that hearing officers are advised to take into account when weighing the significance of opinions offered by nonmedical sources, not the least of which includes the consistency of the opinion with other evidence in the record. *Id.* at *4–5 (listing five nonexhaustive factors). This district, on at least one occasion, has declined to give a teacher's assessment of an SSI claimant due deference *because* it stood at odds with the bulk of the evidence in the record. *See, e.g., Cohn ex rel. R.Y. v. Astrue,* No. 10–CV–214, 2012 WL 1068824, at *3 (N.D.N.Y. Mar. 29, 2012) (McAvoy, J.) (reasoning that the hearing officer was not required to give special weight to a teacher's assessment of a claimant because she "had known [the claimant] for only one month at the time of her evaluation *and* her assessment contrasted with the other substantial evidence of record" (emphasis added)). Here, the evidence overwhelmingly supports a finding of disability. In her 2008 psychiatric evaluation, Dr. Payne found notable impairments in J.J.P.'s ability to follow directions, comprehend information, and ask

questions, Admin. R. at 326–27, and the 2009 follow-up medical evaluation by Dr. Foster drew attention to J.J.P.'s compulsiveness and "difficulty processing multi step commands," *id.* at 432. In addition, the 2009–2010 IEP recommended continued special education services and a decreased class size for J.J.P., citing the need for her to be repeatedly prompted and redirected among the many reasons for such action. *Id.* at 131–32, 134, 240. What is more, Shankar reported sustained and substantial delays in J.J.P.'s development in an entry produced in tandem with the special education annual review that took place *more than one year* after the initial teacher questionnaire. *See id.* at 404–06. Specifically, Shankar recounted that J.J.P. "require[d] frequent redirections and support to follow the classroom routine," "need[ed] help with problem solving as well as negotiating skills," could "only recognize the letter J," had difficulty tracing letters and images, experienced challenges in cutting with scissors, and found it hard to answer "simple wh-questions." *Id.* at 404. Although Shankar did acknowledge that J.J.P. had the capacity to "consistently identify basic colors," "match items that are the same as well as sort them by color," and "understand some early concepts such as big/little and heavy/light", *id.*, these gains appear relatively modest when compared to the preceding list of developmental issues still present. The hearing officer's selective culling of the evidence in the record is therefore inappropriate. *See Sutherland v. Barnhart*, 322 F.Supp.2d 282, 289 (E.D.N.Y. 2004) ("It is not proper for the [hearing officer] to simply pick and choose from the transcript only such evidence that supports his determination, without affording consideration to evidence supporting the plaintiff's claims.")

The hearing officer's attribution of J.J.P.'s problems to her young age was also improper. In her teacher questionnaire, Shankar wrote that J.J.P. was "younger than *most* children in the classroom" and that "*[o]ne* of the reasons for her immaturity is her age." Admin. R. at 293 (emphases added). Given the explicit language employed by Shankar, it cannot be inferred that Shankar sought to represent J.J.P.'s youth as the *primary* cause of her cognitive and behavioral issues. Regardless how these statements may be construed, they were ancillary to the grander conclusions reached in Shankar's assessment (as evidenced by the fact that they were made in the section of the questionnaire titled "Additional Comments"). *Id.*

Finally, the fact that J.J.P. had begun taking ADHD medication in June 2009 did not mean the medication would necessarily be effective in treating her. The record contains no medical account of the effectiveness of Focalin XR in decreasing the severity of J.J.P.'s impairments. Anecdotal evidence, however, suggests that the prescribed medication may not in fact prove to be a panacea: at the SSI hearing on October 6, 2009, Archer testified that Focalin XR did little to curb J.J.P.'s impulsive behaviors, *id.* at 31, and informed the hearing officer of her interest in either increasing the medication's dosage or exploring behavioral modification therapy as a substitute for medication, *id.* at 48–49. While there is no scientific data available in the record to substantiate Archer's account, neither the record nor the hearing officer present anything close to substantial evidence supporting an alternative proposition.

Therefore, the hearing officer erred in finding that J.J.P. suffered from less than marked limitation with regard to the domain of acquiring and using information.

**2. Attending and Completing Tasks**

The domain of attending and completing tasks is focused principally on assessing

the degree to which a child can "focus and maintain ... attention, and ... begin, carry through, and finish ... activities." 20 C.F.R. § 416.926a(h). According to the Regulations, a normally functioning preschool-age child should be able to hold her attention in play and educational settings, dress herself, feed herself, put away her possessions, and refrain from interrupting others. *Id.* § 416.926a(h)(2)(iii). Evidence of limited functioning in the domain of attending and completing tasks includes being easily distracted by environmental stimuli, frequently interrupting others, and requiring substantial adult supervision. *Id.* § 416.926a(h)(3)(i)-(iii), (v).

■ A review of the record in its totality amply supports a finding of marked limitation in J.J.P.'s ability to attend and complete tasks. The arguments put forth by the hearing officer that rest upon Shankar's one-month relationship with J.J.P. and J.J.P.'s age fail for the same reasons as did those made in connection with the domain of acquiring and using information. Moreover, aside from a brief exposition on J.J.P.'s average-level cognitive functioning, ability to play cooperatively, and sustained attention while listening to stories, the majority of the evidence cited by the hearing officer actually *favors* Archer's position. In particular, he mentioned that J.J.P. "was noted to get distracted by objects and sounds in the classroom," "had a hard time attending to tasks that were asked of her," "required a physical prompt to get her back on task," "needed frequent behavioral limits," and displayed an "agitated" mood. Admin. R. at 16. The hearing officer also acknowledged that J.J.P.'s 2009–2010 IEP recommended continued speech therapy, OT, PT, and social work counseling. *Id.* The hearing officer's observations comport with those of Shankar, who, in her January 2008 teacher questionnaire, recorded serious or very serious problems in seven out of thirteen listed activities pertaining to the domain of at-

tending and completing tasks, *id.* at 288, and, in her spring 2009 review, noted that J.J.P. demonstrated challenges in concentration, self-control, and hygiene and eating, *id.* at 404–06. Dr. Payne recorded similar observations in her April 2008 child psychiatric evaluation. *See id.* at 326–27 (describing J.J.P.'s "impaired" attention and concentration skills, inability to care for herself, and need for "frequent supervision," *id.* at 326).

Therefore, the hearing officer's finding that J.J.P. suffered from less than marked limitation with regard to the domain of attending and completing tasks is arbitrary and capricious as matter of law.

### 3. Interacting and Relating with Others

The domain of interacting and relating with others is focused principally on assessing the degree to which a child can "initiate and sustain emotional connections with others, develop and use the language of [her] community, cooperate with others, comply with rules, respond to criticism, and respect and take care of the possessions of others." 20 C.F.R. § 416.926a(i). According to the Regulations, a normally functioning preschool-age child should be able to interact with peers and adults, foster friendships, and use relatively complex language. *Id.* § 416.926a(i)(2)(iii). Evidence of limited functioning in the domain of attending and completing tasks includes an absence of close friends, an inclination to withdraw from others, and difficulty communicating generally. *Id.* § 416.926a(i)(3)(ii)-(iii), (v)-(vi).

■ The record is inconclusive on the question of whether J.J.P. has a marked limitation in the domain of interacting and relating with others. Admittedly, the hearing officer's arguments based upon Shankar's one-month relationship with J.J.P. and J.J.P.'s age fail for the same reasons as did those made in connection

with the domain of acquiring and using information. The hearing officer's reliance on Shankar's other observations, however, is well founded. In her January 2008 teacher questionnaire, Shankar reported only one serious problem in J.J.P.'s ability to interact and relate with others—each of the remaining twelve activities listed in this section of the questionnaire were deemed either a minor problem or not a problem at all. Admin. R. at 289. Although Shankar pointed out that J.J.P. "ha[d] a hard time following classroom routine" and "[did not] have much interaction and conversations with other children in the classroom," she also stated that J.J.P. "[was] not a behavior problem" and said that she had little difficulty understanding J.J.P.'s speech. *Id.* at 289–90.

The initial preschool evaluations also present conflicting evidence. The speech and language evaluation, conducted by Marchant and Desrosiers in November 2007, produced mixed results: while J.J.P. showed significant delays in her receptive and total language abilities, she had only a mild delay in expressive language ability, and no delays in oral-motor skills, intelligibility, and use of voice.[16] *Id.* at 260–61. Moreover, although J.J.P.'s scores on the DAS–II and BASC–2 showed significant deficiencies in J.J.P.'s overall cognitive ability, verbal reasoning skills, and nonverbal reasoning skills, *id.* at 251–52 (reporting scores ranging from the 4th to 6th percentiles), and clinically significant levels of hyperactivity, aggression, and attention problems, respectively, *id.* at 254, her scores on the Vineland–II revealed written communication, daily living, and socialization skills well within the average or above-average ranges, *id.* at 252–53. During the November 2007 psychoeducational evaluation, J.J.P. exhibited a clinically sig-

nificant level of maladaptive behavior, *id.* at 253–54, provoked and bullied her peers, failed to follow teacher instructions, *see id.* at 249–50, and, at an off-site treatment location, even went so far as to "throw[ ] blocks at the examiner, push[ ] testing materials off the table, rip[ ] the stimulus book, and hit[ ] the examiner." *Id.* at 250. Yet regardless of whether this Court could justifiably reach an alternative conclusion regarding J.J.P.'s ability to interact with and relate to others, substantial evidence bolsters the hearing officer's position, and as a result, this Court must accord his decision due deference. *See Romasz*, 2012 WL 5334752, at *3.

Therefore, the hearing officer did not err in finding that J.J.P. suffered from less than marked limitation with regard to the domain of interacting and relating with others.

### 4. Effects of a Structured or Supportive Setting

■ The Regulations compel hearing officers to consider numerous factors in evaluating the effects of impairments on a child's functioning. 20 C.F.R. § 416.924a(b). One such consideration is the "effects of structured or supportive settings" on the child's ability to function normally. *Id.* § 416.924a(b)(5). Put simply, "[a] structured or supportive setting may minimize signs and symptoms of [the child's] impairment(s) and help to improve [the child's] functioning while [she is] in it, but [her] signs, symptoms, and functional limitations may worsen outside this type of setting." *Id.* § 416.924a(b)(5)(iv)(C). Therefore, even if the child can function normally while within the confines of the structured or supportive setting, the hearing officer must assess whether the child would be able to function adequately ab-

---

**16.** It is perhaps worth noting, however, that Marchant and Desrosiers warned that their findings ought be "interpreted with caution," given that J.J.P.'s behavioral issues interrupted the testing session. *Id.* at 261.

sent such assistance. *Id.* Although the hearing officer need not make explicit reference to the effects of a structured or supportive setting in order to be deemed to have sufficiently considered them, *Shatraw ex rel. K.C.Y. v. Astrue,* No. 7:11–cv–13 (GLS), 2012 WL 589667, at *4 (N.D.N.Y. Feb. 22, 2012) (Sharpe, C.J.), this district has typically elected to remand "when it is evident that the [hearing officer] did not consider [this] factor," *Gonzalez ex rel. C.C. v. Astrue,* No. 1:07–cv–487 (GLS/VEB), 2009 WL 4724716, at *6 (N.D.N.Y. Dec. 2, 2009) (Sharpe, J.).

Here, the hearing officer failed properly to consider the effects of a structured or supportive setting in his assessment of J.J.P.'s level of disability. In his brief, the Commissioner argues that because the hearing officer referenced in his decision records from a variety of school and medical sources, he adequately considered the effects of a structured or supportive setting on J.J.P.'s ability to function. Def.'s Br. 18. Although there is some truth to the Commissioner's argument, the use of myriad sources ultimately is irrelevant where the hearing officer's decision is not buoyed by *substantial evidence. Cf., e.g., Walker ex rel. J.B. v. Astrue,* No. 1:06–CV–1180 (NAM), 2010 WL 2287566, at *10 (N.D.N.Y. June 3, 2010) (Mordue, C.J.) (finding that the hearing officer's citation to medical records, claimant testimony, and teacher reports reflected adequate consideration of the impact of a structured or supportive setting on a claimant's ability to attend and complete tasks but asserting that "[e]ven assuming that the [hearing officer] failed to consider the impact of claimant's special education classes on his impairments in this domain, the [hearing officer's] decision is nonetheless supported by substantial evidence."); *Hudson ex rel. S.G. v. Astrue,* No. 1:06–CV–1342 (LEK/VEB), 2009 WL 1212114, at *7 (N.D.N.Y. Apr. 30, 2009) (Kahn, J.) (holding that although the hearing officer failed to assess the effects of a structured or supportive setting on the claimant's ability to acquire and use information, "the [hearing officer's] decision was also supported by standardized test results and the opinion of Claimant's treating psychiatrist," the combination of which constituted substantial evidence).

Here, the majority of the evidence in the record indicates that J.J.P.'s functioning is largely dependent upon a self-contained classroom setting. This district has in the past regarded enduring behavioral issues despite a claimant's placement in successively restrictive environments as proof of the claimant's marked limitation in functioning. *See Leonard ex rel. A.J. v. Astrue,* No. 09–CV–029 (TJM/VEB), 2011 WL 7090710, at *7–8 (N.D.N.Y. Nov. 3, 2011) (Bianchini, M.J.). From 2007 to 2010, J.J.P. was placed in classrooms that gave her increasingly individualized attention and supervision, *compare* Admin. R. at 286 (reporting a student-teacher-aide ratio of 15:1:2 in January 2008), *with id.* at 240 (recommending a student-teacher-aide ratio of 12:1:4 at the beginning of the 2009–2010 school year and a revised student-teacher-aide ratio of 9:1:3 to be made effective in October 2009), and received special education services multiple times per week or per month, *id.* at 134, 294–95, 418. During the same period of time, however, J.J.P.'s preschool special education teacher, neurologist, and other medical and psychological evaluators reported little improvement in J.J.P.'s cognitive and social development. Although the hearing officer was under no obligation to make explicit reference to these data in his consideration of the effects of a structured or supportive setting on J.J.P.'s functioning, *see Shatraw,* 2012 WL 589667, at *4, he made no attempt to reconcile the overwhelming evidence of persistent disability in the record with his finding of less than marked limitation in several domains of

functioning. Such an error is fatal to the Commissioner's motion for judgment on the pleadings. *See Smith ex rel. M.H. v. Astrue*, No. 09–CV–921 (GLS/VEB), 2011 WL 1205132, at *7 (N.D.N.Y. Mar. 8, 2011) (Bianchini, M.J.).

Accordingly, the Court rules that the hearing officer failed properly to consider the effects of a structured or supportive setting.

### D. Remand for Calculation of Benefits

Having ruled that the hearing officer erred in denying J.J.P.'s claims for SSI benefits, this Court now considers Archer's request for remand for calculation of benefits. *See* Admin. R. at 25.

Remand for calculation of benefits is appropriate only in cases where the record "provides persuasive proof of disability and a remand for further evidentiary proceedings would serve no purpose." *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir.1980); *see also Butts v. Barnhart*, 388 F.3d 377, 385–86 (2d Cir.2004). Courts are directed to avoid "contribut[ing] any further to the delay of the determination of [a claimant's] application by remanding for further administrative proceedings" when such an instruction would prove unnecessary. *Diaz ex rel. E.G. v. Comm'r of Soc. Sec.*, No. 06–CV–530–JTC, 2008 WL 821978, at *8 (W.D.N.Y. Mar. 26, 2008).

Nearly five years have passed since Archer initially filed for SSI benefits on behalf of J.J.P, *See* Admin. R. at 82. In *Nieves ex rel. Nieves v. Barnhart*, No. 02 Civ.9207(RWS), 2004 WL 2569488 (S.D.N.Y. Nov. 12, 2004), the Southern District of New York ruled that prolonged delays in the resolution of benefits disputes tend to be "harmful for any litigant, but particularly in connection with benefits for children which are not to replace lost income, but to enable low-income families to afford special education, medical treatment, physical rehabilitation, early intervention services, and personal needs assistance for the child." *Id.* at *10. On numerous occasions, this district has endorsed *Nieves* and extended its reasoning. *See, e.g., Myers ex rel. C.N. v. Astrue*, No. 09–CV–1429 (VEB), 2012 WL 4107453, at *11 (N.D.N.Y. Sept. 18, 2012) (Bianchini, M.J.) (holding that a two-year delay permitted remand for calculation of benefits and that "[t]he purpose of providing SSI benefits to children is to assist them *while they are children*" (alteration in original) (emphasis added) (quoting *Molina v. Barnhart*, No. 00 CIV. 9522(DC), 2002 WL 377529, at *10 (S.D.N.Y. Mar. 11, 2002)) (internal quotation marks omitted)); *Dabul–Montini ex rel. N.D. v. Astrue*, No. 09–CV–966 (TJM/VEB), 2010 WL 3584348, at *11 (N.D.N.Y. July 30, 2010) (Bianchini, M.J.) (holding that a near five-year delay warranted remand for calculation of benefits). The protracted period of delay in the instant case counsels against the issuance of an order of mere remand to the Commissioner for further evidentiary proceedings.

Therefore, remand for calculation of benefits is appropriate here.

### III. CONCLUSION

The record so demonstrates that J.J.P. suffers marked limitations in at least two domains of functioning and that the hearing officer's contrary decision is arbitrary and capricious; consequently, this Court rules that J.J.P.'s medically determinable impairment or combination of impairments functionally equals a condition in the Listings. For the foregoing reasons, it is hereby ORDERED that:

1. The Commissioner's motion for judgment on the pleadings, ECF No. 15, is DENIED;

2. The Commissioner's decision denying SSI benefits is REVERSED; and

3. The case is REMANDED to the Commissioner for calculation of benefits.

**SO ORDERED.**